A. E. BURR *et al. v.* WHITE OAK LUMBER CO. *et al.*

*(Nashville.* December Term, 1923.)

1. **DEEDS.** Due execution presumed after twenty years.

Under Thompson-Shannon Code, section 3764, a deed executed for grantor by another as his attorney in fact is entitled to the presumption of due execution after twenty years. (*Post, pp.* 194, 195.)

Acts cited and construed: Acts 1859-60, ch. 91.

Cases cited and approved: Hall v. Gossum, 144 Tenn., 1; Murdock v. Leath, 57 Tenn., 166; Kobbe v. Land Co., 117 Tenn., 320

Code cited and construed: Sec. 3764 (T.-S.)

2. **COURTS.** Decision as to validity of tax deed adhered to.

A decision that a particular tax deed was ineffectual to pass title will be adhered to twenty-seven years later, where the land has been dealt in, sold, and conveyed since such decision, and the validity of the deed is in controversy in other cases pending in the supreme court. (*Post, pp.* 195-197.)

Cases cited and approved: Sheafer v. Mitchell, 109 Tenn., 181; Anderson v. Williams, 18 Tenn., 234; Anderson v. Patton, 20 Tenn., 369; Randolph v. Metcalf, 46 Tenn., 402.

3. **COURTS.** Decisions establishing rule of property or affecting title to realty should not be disturbed, though originally erroneous.

Decisions long acquiesced in, which constitute rules of property or trade or bases of important rights, especially rules, generally known and acted on, affecting title to realty, should not be disturbed in a case presenting the same question on the same facts, though erroneous as original holdings. (*Post, pp.* 197, 198.)

Cases cited and approved: Sherfy v. David Argenbright et al., 48 Tenn., 143; Case v. Joyce, 89 Tenn., 337; Wilkins v. Railroad, 110 Tenn., 442; Memphis v. Wright, 14 Tenn., 497.

Burr v. White Oak Lumber Co.

Case cited and distinguished: State ex rel. v. Baseball Club, 127 Tenn., 292.

4. **COURTS.** Decree declaring tax deed ineffectual followed, though rendered without written opinion.

That a decree of the supreme court declaring a tax deed ineffectual to pass title was rendered without written opinion made it no less effective to declare the law of the title to such realty, being necessarily relied on by every one examining the title thereto and purchasing any part thereof. (*Post, pp.* 198, 199.)

5. **BOUNDARIES.** Eastern boundary line of grant claimed by plaintiff in ejectment fixed.

The eastern boundary line of a grant of land described as beginning at the northwest corner of a certain survey, which was described as beginning on the line between Campbell and Fentress counties, and running west nine hundred poles, *held*, in view of other calls of that and other surveys and entries, Acts 1817, chapter 20, and Acts 1823, chapter 302, establishing the boundaries of the two counties, to be nine hundred poles west of the Cumberland river, and not nine hundred poles west of the present county line. (*Post, pp.* 199-206.)

Acts cited and construed: Acts 1817, ch. 20; Acts 1823, ch. 302.

---

FROM FENTRESS.

---

Appeal from the Circuit Court of Fentress County.— HON. XEN. HICKS, Judge.

WARD R. CASE and J. T. WHEELER, for appellants.

L. T. SMITH and CONATSER & WRIGHT, for appellees.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

This is an action of ejectment, in which the plaintiffs seek to recover a tract of land alleged to be the interlap between grant No. 4712, under which the plaintiffs claim, and grant No. 13008, under which defendants claim.

The cause was tried before the circuit judge and a jury. After all the evidence was introduced, the plaintiffs and the defendants each made a motion for a directed verdict. The court overruled the motion of the plaintiffs, and sustained the motion of the defendants. Verdict was accordingly rendered, and judgment pronounced in favor of the defendants, dismissing the plaintiffs' suit. Motion for new trial was made by the plaintiffs and overruled, and they have appealed to this court.

In the court below plaintiffs' right to recover was challenged upon four grounds: (1) That the plaintiffs' title papers did not cover and include the land sued for. (2) The grant under which the plaintiffs claim title was issued to John B. McCormick July 20, 1836, and plaintiffs connect with John B. McCormick by virtue of a deed which Thomas B. Eastland purports to have executed in the name of and as attorney in fact of John B. McCormick to John Seymour on March 14, 1837. Plaintiffs rely upon a power of attorney executed by John B. McCormick to said Eastland, dated August 13, 1836, and the presumption as to the power of attorney and the deed arising under chapter 91 of the Acts of 1859-60 (Shannon's Annotated Code, section 3764.). The defendants challenge this link in the plaintiff's chain of title. (3)

149 Tenn.—13.

Defendants claim to have defeated plaintiffs' title under the statutes of limitations, by reason of having had seven years and more of adverse possession. (4) Defendants assert that the real title to this land is outstanding in one A. Matson, by reason of a tax deed executed to Freddie Matson July 16, 1861, based upon proceedings by which the lands were sold for the taxes for the year 1855 as the property of one John S. Smith.

The trial court was of opinion that this tax sale was valid and that the title to the land covered by the plaintiffs' title papers was outstanding. He accordingly dismissed the plaintiffs' suit, without passing upon or adjudicating any of the other questions involved in the case, which we have just stated.

We may dispose of the second and third defenses noted above in a few words. The power of attorney from McCormick to Eastland, when offered in evidence, was objected to on the ground that it contained no sufficient description of the land which it undertook to authorize Eastland to convey. This exception was overruled. If this was error, nevertheless it makes no difference. If the power of attorney be excluded, then we have a deed executed for McCormick by Eastland as attorney in fact March 14, 1837, which was duly recorded. Under section 3764, Thompson's Shannon's Code, this deed so executed is entitled to the presumption of due execution after twenty years. It follows, therefore, that Eastland's authority to convey for McCormick and the validity of the deed had become a presumption of fact before the deed was in any way challenged. The objections to the deed made by the plaintiffs are not available under *Hall* v. *Gossum*, 144

Tenn., 1, 228 S. W., 1039; *Murdock* v. *Leath*, 10 Heisk. (57 Tenn.), 166; *Kobbe* v. *Land Co.*, 117 Tenn., 320, 98 S. W., 175.

As to the third defense, we find no material evidence of as much as seven years adverse possession by the defendants on the interlap between grant No. 4712 and grant No. 13008.

As stated above, the trial judge was of opinion that the tax deed to Freddie Matson of date July 16, 1861, was valid, and that the title to the land sued for passed by that deed and was outstanding. He reached this conclusion upon the authority of *Sheafer* v. *Mitchell*, 109 Tenn., 181, 71 S. W., 86. As an original proposition, his honor may have ruled correctly. He is rarely mistaken in any conclusion that he reaches. We are of opinion, however, that the validity of this tax sale is not an open question in Tennessee.

The tax deed here involved was executed by B. Lee, tax collector of Fentress county, to Freddie Matson July 16, 1861, following certain proceedings in the circuit court of that county. It undertook to convey title to several grants, among others grant No. 4712, under which the plaintiffs here claim, and grant No. 4773.

A suit was brought in the chancery court of Fentress county in 1893, by Martha M. Darrow and others, against John C. Wright, and others, in which complainants sought to recover grant No. 4773. The bill was answered, and a number of defenses interposed. At the trial the tax deed of B. Lee to Freddie Matson and the court proceedings upon which it was based were relied on by the defendants. A transcript of said court proceedings and a copy of the

tax deed was introduced by the defendants as evidence
of an outstanding title. Nevertheless there was a decree
by the chancellor in *Darrow* v. *Wright* in favor of the
plaintiffs.

This cause was appealed to this court, and transferred
by this court and heard in the court of chancery appeals.
In the latter court it was specifically assigned as error
that the chancellor improperly held "that the transcript
of record from the circuit court and the deed from B. Lee,
tax collector, to Freddie Matson was void."

The court of chancery appeals in its opinion disposed of
the assignments of error *seriatim,* and said of the assign-
ment just mentioned:

"As to fifth objection or assignment of error, that chan-
cellor erred in holding tax title introduced void and no
defense:

"This was for a tax sale made in 1858 for taxes of 1857,
and was void, as we think, for several reasons. It does
not properly appear that the land sold was in Fentress
county. It does not appear that proper advertisement
was made. It does not properly appear the land was prop-
erly assessed. Summary proceedings must affirmatively
show all facts necessary to give jurisdiction. All facts
must appear and in the proper way and from proper
source. *Anderson* v. *Williams,* 10 Yerg., 234, *Anderson* v.
*Patton,* 1 Humph., 369, *Randolph* v. *Metcalf,* 6 Cold.,
402."

The court of chancery appeals affirmed the decree of the
chancellor, and the defendants appealed to this court. In
this court the action of the chancellor and of the court
of chancery appeals in holding the tax sale void and the

tax deed ineffectual to pass title was specifically assigned as error. This court by decree rendered at its October term, 1896, in all things affirmed the decree of the court of chancery appeals.

This tax deed undertook to carry title to about sixty thousand acres of land. This land has been dealt in, sold, and conveyed since 1896. The validity of this particular tax deed is in controversy in at least three cases now pending in this court. We feel that we must adhere to our former decision holding the said tax title bad as an outstanding title, in view of the circumstances stated.

A title previously passed upon, although in a suit between different parties, ought not to be again controverted and examined in a case presenting the same question upon the same facts.

"Decisions long acquiesced in, which constitute rules of property or trade, or upon which important rights are based, should not be disturbed, even though erroneous as original holdings." *State ex rel.* v. *Baseball Club,* 127 Tenn., 292, 303, 154 S. W., 1151, 1154 (Ann. Cas., 1914B, 1243.)

"Where a decision, or series of decisions, have established a rule of property, and more particularly a rule affecting title to real estate, which has become generally known, and has been acted upon, such a landmark should not be disturbed." *Sherfy* v. *David Argenbright et al.,* 1 Heisk. (48 Tenn.), 143, 2 Am. Rep., 690.

"A decision of this court which for eleven years has constituted a rule of property, of frequent application affecting the titles to real estate, should be adhered to after repeated recognitions by this and the other courts

of the State, regardless of whether it was originally correct or incorrect." *Case* v. *Joyce,* 89 Tenn., 337, 16 S.. W., 147, 12 L. R. A., 519.

In the case of *Wilkins* v. *Railroad,* 110 Tenn., 422, 75 S. W., 1026, the nature of the title of the City of Memphis in a strip of land along the Mississippi river was involved. The same question had previously been before the court in *Mayor and Aldermen of Memphis* v. *Wright,* 6 Yerg. (14 Tenn.), 497, 27 Am. Dec., 489. In the latter case, while the court was of opinion that the earlier case was perhaps wrongly decided, nevertheless it felt bound to adhere to the earlier decision, because it was said that the earlier decision established "a rule of property controlling the strip of land in controversy."

So we think that the decision of *Darrow* v. *Wright* established a rule of property as to the land conveyed by the tax deed from B. Lee to Freddie Matson. This decision became the law of the Matson title, and we are not willing to disturb it after twenty-seven years.

Although there was no written opinion in *Darrow* v. *Wright,* the decree was none the less effective to declare the law of that title. It was necessarily relied on by every one who examined the title to any portion of this land and purchased any portion thereof.

In a note in Ann. Cas. 1914A, at page 1083, many cases are collected in which it has been held that, where a particular transaction has been judicially passed on in proceedings between other parties, the doctrine of *stare decisis* requires adherence to the decision so made, where the same will or same contract or same accident is involved.

A map accompanying the plaintiffs' brief correctly represents the contentions of the parties with respect to the

interlap of the two grants and correctly presents the situation shown by all the maps which were introduced in evidence.

As heretofore stated, the plaintiffs claim under grant No. 4712, issued to John B. McCormick, whereas the defendants claim under grant No. 13008. Plaintiffs' grant is older and superior to that of the defendants. The question of superiority is immaterial if the land in dispute is not covered by the plaintiffs' grant.

Plaintiffs' grant No. 4712 describes the land granted therein as follows:

"A certain tract or parcel of land containing five thousand acres by survey bearing date of the 4th day of July, 1836, lying in said county, beginning on two white oaks, the northwest corner of a five thousand acre survey of David Griffith; thence west nine hundred poles to a stake; thence south nine hundred poles to two hickories and a white oak; thence east nine hundred poles to three white oaks; thence north nine hundred poles to the beginning."

It is easily observable that the location of the land described by the grant aforesaid depends upon the location of the northwest corner of the five thousand acre survey of David Griffith. The David Griffith entry and survey thereof are both found in the record, and while there is no apparent conflict between the entry and the survey, the language describing the land in them is not exactly alike. So that it will be proper and helpful to have in mind both the language of the entry and the language of the survey. The Griffith entry No. 741 is in the following language:

"Beginning on a line between Campbell and Fentress counties and on the southeast corner of an entry made in

this office in the name of Thomas Butler for five thousand acres; thence with the said Fentress and Campbell county line meandering the South fork; thence west; thence north; thence east to the beginning."

The survey of the David Griffith entry reads as follows:

"Beginning on a stake on the line between Campbell and Fentress county, the southeast corner of a five thousand acre survey of Thomas Butler; thence south with said county line nine hundred poles to a stake; thence west nine hundred poles to two white oaks; thence north nine hundred poles to two white oaks; thence east nine hundred poles to the beginning."

It is the contention of the plaintiffs that the beginning corner of the Griffith survey is at the south fork of the Cumberland river, and that the river forms the eastern boundary of the survey, and that the western boundary of this survey is to be located either by running a line fixing the southwest corner at a point nine hundred poles west of the river, or by locating the northwest corner at nine hundred poles west of the river. The proof is, that the point on the river where plaintiffs claim the Griffith survey begins is practically due north of the southeast corner, and therefore it makes no difference whether the survey be located by running the lines in the order they are named in the survey or whether the calls be reversed. If the David Griffith survey is located as claimed by the plaintiffs, then grant No. 4712 which calls to begin on the northwest corner of the Griffith survey will lie so as to embrace within it the disputed land.

The defendants contend that the northeast corner of the Griffith survey is at a point about two hundred and

twenty poles east of the south fork of the Cumberland river. The basis for this contention is that the Campbell county line is at that point, and also that there are trees and marks along what would be the western boundary of that survey, if it began on the Campbell county line. If this contention be correct, then the plaintiffs' grant must be located some two hundred and twenty poles eastward of the location claimed by the plaintiffs, and it will not cover and embrace the disputed land.

There is no proof at all even tending to show that the northeast corner of the Griffith survey is located as claimed by the defendants. The evidence shows unmistakably that, at the time this Griffith entry and survey were made, Campbell and Fentress counties did not adjoin each other, either along the line claimed by the plaintiffs or by the defendants. The county line of Fentress county, at the time of this survey and at this point, was as established by chapter 302 of the Acts of 1823 (Whitney's Land Laws, p. 748). The description of this line is found in the act as follows:

"That a new and distinct county be, and the same is hereby established east of the county of Overton, to be known and distinguished by the name of Fentress county, beginning at the northeast corner of said county of Overton (when reduced) in the Kentucky line; running thence east, with the Kentucky line, to the south fork of the Cumberland river; thence up the same as it meanders to the Clear fork; thence up the same to the forks, where Pile's turnpike was formerly kept."

The David Griffith survey was altogether in Fentress county, and according to the calls of the eastern boundary

line of that county the Griffith survey would be altogether west of the river. It will also be observed that the entry calls for the eastern boundary line as meandering the south fork, and also calls to begin at the southeast corner of an entry made in the name of Thomas Butler, which as we shall see by an examination of the Butler survey, is without a doubt located on the river.

The Butler entry is No. 740. It is described in the entry as follows:

"Beginning on the west boundary of Campbell county and on the southeast corner of an entry for five thousand acres this day made in this office in the name of George W. Gibbs, running thence southwardly meandering the South fork with the line between Campbell and Fentress; thence west; thence north; thence east to the beginning."

The Butler survey reads as follows:

"Five thousand acres of land in said county on the Big South fork of Cumberland river, beginning on a black oak on the west boundary of Campbell county, on the southeast corner of a five thousand acre survey in the name of George W. Gibbs; thence southwardly up said Big South fork six hundred and forty poles to a stake; thence west one thousand two hundred and eighty poles to two white oaks; thence north six hundred and forty poles crossing White Oak creek to two maples and a hickory; thence east one thousand two hundred and eighty poles to a black oak on the west bank of the Big South fork to the beginning."

Thus it will be seen that the Butler entry and survey, although calling for its beginning point as being a black oak on the west boundary of Campbell county, specifically

locates the black oak called for as being on the west bank of Big South fork.

That the southeast corner of the Butler survey is located on the Big South Fork river is further demonstrated by reference to the George W. Gibbs survey which it calls for, and which confessedly has its southeast corner on the bank of the river. Thus it is established that the northeast and the southeast corners of the Butler survey are on the west bank of the South Fork river, and therefore the Griffith survey, which calls for the Butler survey, must necessarily be located there. It is furthermore seen that the Griffith survey shows that the east boundary line calls for the meandering of the river.

The only circumstance tending to locate the Griffith survey elsewhere is the fact that both the Butler and Griffith survey call for the Campbell county line. The Campbell county line does not in fact follow the river at this point, as will be observed by comparison of the calls of the act of the legislature establishing Campbell county line at this point, and according to which it ran when the surveys of these entries were made.

The Campbell county line at this point is found in chapter 20 of the Acts of 1817 (Whitney's Land Law, p. 723). It reads as follows:

"That from and after the passage of this act the line hereinafter mentioned shall be the dividing line between the counties of Anderson and Campbell, that is to say: Beginning on Clinch river at the first bluff above the island ford; thence with the dividing ridge between Cove and Cole creek to Wallen's ridge, and thence with Wallen's ridge to the line run by William Hogshead under the act

of 1811; thence with that line to New River; thence down New River to the mouth of Smoky creek; thence to the dividing ridge which divides the waters of New River and Brimstone, so as to leave Smoky creek in Anderson county; thence with said dividing ridge to a point one-half mile above the mouth of Brimstone, leaving the waters of New River in Campbell county and the waters of Brimstone in Anderson county; *from thence north forty-five degrees west to the Kentucky line; and that tract of country which lies north and east of the before described line shall compose* and be a part of the county of Campbell."

It is perfectly obvious that the western boundary line of Campbell county as described by this act does not correspond with the eastern boundary of Fentress county as it is described in the act heretofore referred to. The only proof as to the location of the Campbell county line as described in the act is found in the testimony of Mr. Conatser, who says on that subject that the mouth of Brimstone called for in the act, from which the line 45 degrees west to the Kentucky line starts, is about three-quarters of a mile east of the town of New River. It does not appear just how far from the mouth of New River the town of New River is located, but the town of New River is on New River and is below the mouth of Brimstone; so that this line north forty-five degrees west to the mouth of Brimstone would eventually cross, according to Mr. Conatser, the South fork. Mr. Conatser says the corner of the Griffith survey as its location is claimed by the defendants would be something like a mile west of this county line of Campbell county which runs from the mouth of Brimstone west forty-five degrees to the Kentucky line.

Burr v. White Oak Lumber Co.

Even according to the defendants' contention the northeast corner of the Griffith survey is not located on the western boundary line of Campbell county. Certainly there is no proof that the Campbell county line is at the point where defendants claim the northeast corner of the Griffith survey is located.

It is quite evident that the surveyor assumed that the western boundary line of Campbell county was the same as the eastern boundary line of Fentress county at this point, whereas in fact both by comparison of the boundaries of the two counties as contained in the acts, and by the testimony of Mr. Conatser, there was at that time a considerable strip of land which belonged to Anderson county between the eastern boundary of Fentress county and the western boundary of Campbell county. As conclusive evidence of this is the fact that the northeast corner of the Griffith grant is called for as being located on the river and to run south meandering the river. To run with the Campbell county line it would have to run south 45 degrees east at least a part of the way and then with the dividing ridge which divides the waters of New River and Brimstone. The surveyors could not have been mistaken about the location of the river itself. They may very well have been mistaken about the location of the Campbell county line. It is certain that the Fentress county line at this point was the river and the entries and surveys called for the Fentress and Campbell county line. Therefore they very naturally supposed that the Fentress county line was the same as the Campbell county line and that the river was that line. No other reasonable inference can be drawn.

The only other testimony relied upon as sustaining the defendants' location is that of surveyors who claim to have found marked corners and marked lines both on the eastern and western boundary lines of the plaintiff's grant No. 4712. This evidence falls short of fixing the location at these lines, because the marks upon the trees, while shown to be old marks, are shown by the defendants' own witness, an experienced woodsman, not to be old enough to correspond with the original survey. In the next place the northeast corner of grant No. 4712 as claimed by the defendants is some two hundred and twenty poles short and east of the point where it is called for in the grant to be; that is to say, the grant calls to begin at the northeast corner of the Griffith survey, and the Griffith survey calls to begin nine hundred poles west of the river. In the absence of any proof to show that it was actually surveyed and marked at the point claimed by the defendants or elsewhere, the conclusion must be necessarily drawn that the eastern boundary line of plaintiffs' grant is nine hundred poles west of the river as it is claimed by the plaintiffs.

The basis of the dispute in fact turns upon whether or not the Griffith survey begins at the river or at a point two hundred and twenty poles east of the river. As we have seen this contention must be settled in favor of the plaintiffs. This conclusion locates the grant in controversy as claimed by the plaintiffs, since its location depends upon the location of the Griffith survey.

For the reasons stated, we conclude that the trial judge should have sustained the motion for a directed verdict in favor of the plaintiffs. It will be so ordered here.