Old Nat. Bank *et al. v.* Swearingen *et al.*

(*Jackson,* April Term, 1934.)

Opinion filed May 31, 1934.

F. J. SMITH and R. P. WHITESELL, both of Union City, for appellants.

FENNER HEATHCOCK and E. H. LANNOM, both of Union City, for appellees.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

This suit involves an effort of the Old National Bank, as guardian of certain minors, to subject real estate conveyed in trust by Mrs. Anna B. Morgan, deceased. The trust conveyance was made to secure a loan made to Mrs. Morgan by the bank and evidenced by note in the sum of $3,000. The chancellor rendered a decree against the administrator of Mrs. Morgan for the amount due on her

note, but dismissed the bill in so far as it sought to enforce a lien on the land. The case was tried on a stipulation of the facts, and the bank appealed directly to this court.

The principal question is as to the nature of the estate that Mrs. Morgan took in certain property passing under her husband's will and as to the nature of the powers conferred upon her with respect to that property as executrix of said will.

The husband, James R. Morgan, died in 1904, leaving his widow and three daughters. The widow, Mrs. Anna B. Morgan, died in 1932. All the daughters married. Two died before their mother, one of them leaving a child, the other without issue. The third survives, and she has three living children.

At the time of his death, James R. Morgan owned a tract of land containing about 161 acres adjacent to the town of Union City. He also owned a business house in Union City known as the Morgan-Hardy store house and a two-story brick residence in Union City in which he lived. Morgan likewise owned a considerable number of shares in a mercantile corporation known as the Morgan Verhine Company and a considerable number of shares in a corporation known as the Morgan-Hardy Grain Company. There was perhaps other property which it is not necessary to mention.

Morgan left a will, naming his wife executrix, as heretofore mentioned, which will was duly probated. It is rather a lengthy document, and we refer to such provisions only as are material to this inquiry. Speaking generally, testator gave all his property to his wife for life or for widowhood, with remainder to his daughters

for life, with remainder in fee to the issue of such daughters. Substitute gifts were provided in the event of the death of any of his daughters without issue.

Item 2 of the will is as follows:

"I authorize and empower my said Executrix to take possession of all my property of every kind, real and personal, to pay all my just debts, and my funeral expenses, as early as practicable; to sell so much and such parts of my said property at private sale, as in her judgment may be necessary to pay all my debts and liabilities; and for such time as she may deem proper, to continue and carry on in her name as such Executrix my business enterprises for the benefit of my estate and to that end she is authorized and empowered to make such sales of any portion of my property, either real or personal, as she may deem necessary or expedient; she is also authorized and empowered, if she deems it proper or expedient to do so, from time to time, to encumber such portions of my said property as she may deem necessary, by hypothecating the same, or by mortgaging the same, or by executing trust deeds thereon, for the purpose of raising the necessary sums of money to pay off any debt or debts I may owe, or for the purpose of continuing and conducting said business enterprises, and meeting and discharging such debts and obligations as may arise out of said business from time to time."

In 1915, by proceedings in the chancery court of Obion county, the tract of 161 acres was exchanged for business property in Union City known as the Wehman building. The farm land produced little or no income, and the court was of opinion that the exchange of properties was in the interest of all the beneficiaries of Morgan's will.

All proper parties were joined in that case. In that case the chancellor expressly decreed, denying her contention to that effect, "that complainant Mrs. Anna B. Morgan, as such executrix, does not have the power and authority to make said conveyance of said tract of land, upon a proper construction of said will." Thereupon the chancellor considered the proof and found, as stated above, that the said exchange of properties was manifestly for the advantage of the interested parties. A deed to the Wehman building was submitted and approved by the chancellor, which instrument passed title to that property to be held by Mrs. Morgan for the use of herself and her daughters according to the terms and the provisions and subject to the limitations of the will of James R. Morgan.

It appears that Mrs. Morgan disposed of her husband's holdings in the two mercantile corporations many years ago. At the time of her death, she had no property of her own other than that acquired under her husband's will. The rentals from such property at this time amounted to $4,400.16. It seems that Mrs. Morgan was in bad health during the latter part of her life, that she helped her children and grandchildren, and that the income had not been sufficient to pay her expenses and keep up the property.

In September, 1930, Mrs. Morgan owed $706.50 for a new roof placed on the Wehman building. She also owed 1929 municipal taxes on the Morgan real estate amounting to $799.20, 1930 municipal taxes amounting to $720, 1929 state and county taxes amounting to $531.47. The total of this indebtedness was $2,757.17, and the indebtedness was paid out of the proceeds of the loan obtained by Mrs. Morgan from the Old National Bank,

guardian. For this loan she executed an individual note in the sum of $3,000 and as an individual executed a trust deed on the Wehman building to secure the note. Her right so to incumber the property is challenged herein by her surviving daughter and her grandchildren.

The bank contends that Mrs. Morgan was given such full power over the estate devised by her husband as to negative the idea of a life estate and to defeat the limitation over. The bank further contends that, in any event, Mrs. Morgan was given such power over the estate under item 2 of the will above quoted as to authorize her to execute the mortgage in favor of the bank for the purposes mentioned. Still a further contention of the bank is that, if mistaken as to the other propositions, since its money went to discharge mechanics' and tax liens, it is entitled to be subrogated to the claim of the lienholders whose demands were discharged.

Counsel for the bank make an elaborate argument endeavoring to show that it was the intention of her husband to confer upon Mrs. Morgan the full power of disposition of his estate. We cannot undertake to follow all the details of this argument. We think it is not well founded. Looking to the will as a whole, we think the testator contemplated that the income from the estate would be abundant to meet the needs of his wife and family. There are two or three provisions in the will as to the investment of the surplus of the income. Mrs. Morgan was given full power with respect to the use of the income for the benefit of herself and children, but she was not given power so to deal with the corpus of the estate; that is, the real estate.

By item 3 of the will the residence was given to Mrs.

Morgan for life to be used as a home for herself and such of the children as remained with her, and she was authorized, if she deemed it best, to sell the homeplace. It was, however, provided that she "reinvest the proceeds of any portion thereof in any other home, the title to be taken to her for life, and the said proceeds of said place, if sold, to be held, used and enjoyed by her for life, with the remainder therein, or in said homeplace, if not sold, over to my children, as hereinafter provided."

From the foregoing it appears that, even as to the homeplace, Mrs. Morgan was only given power to sell that property for purposes of reinvestment, and we find nothing in the will which authorized her to sell or incumber other real estate left by the testator, save as such power is conferred on her by item 2.

Reverting to item 2 of the will previously set out. Mrs. Morgan was given power to sell so much of testator's property as was necessary to pay his debts. She was given power, for such time as she thought proper, to continue the business enterprises in which testator had been engaged for the benefit of his estate, and for the purpose of carrying on these business enterprises she was authorized to make sales of testator's property. Likewise "to that end," that is, for carrying on the business enterprises, she was authorized "to encumber such portions of my property as she may deem necessary, by hypothecating the same, or by executing trust deeds thereon," for the purpose of raising money to pay testator's debts "or for the purpose of continuing and conducting said business enterprises, and meeting and discharging such debts and obligations as may arise out of said business from time to time."

We think there can be little doubt that by "business enterprises" testator was referring to the mercantile corporations in which he was interested. Since the continuance of these enterprises was left to the wife's judgment, there was an implied power to sell such interests, if she thought best. The will gave the wife power to sell or mortgage the real property to raise funds to continue these business enterprises. When she sold testator's interests in the business enterprises, and after she paid testator's debts, we find no further power in the will to authorize a sale or pledge by her of the real estate. The chancellor reached the same conclusion nearly twenty years ago. His decree to this effect has been of record since 1915. So far as this real estate is involved, this decree of the chancellor, if it were not plainly correct, might nevertheless be followed as the law of this title. *Burr* v. *White Oak Lumber Co.*, 149 Tenn., 191, 258 S. W., 798.

The case presented to us is really one in which Mrs. Morgan has undertaken to incumber this property to raise funds to discharge debts for which she was personally liable. As life tenant, it was her duty to pay the taxes on the property and to keep up ordinary repairs. As heretofore stated, she received a gross income of $4,400. While this perhaps was not enough to supply her wishes and the wishes of her children, it was enough to keep up the property and provide for her, at the same time, a comfortable living. Nothing can be plainer, from a careful reading of testator's will, than that he expected his widow to live within her income, and indeed to save and reinvest some part of the income.

We are furthermore of the opinion the chancellor correctly held that the bank herein was not entitled to any lien upon this real estate by way of subrogation.

Since *Motley* v. *Harris,* 69 Tenn. (1 Lea), 577, this court has repeatedly held that a mere volunteer who pays the debt of another is not entitled, without more, to be substituted to liens held by the original creditor. Earlier decisions were strict in the application of this rule. See *Durant* v. *Davis,* 57 Tenn. (10 Heisk.), 522; *Owens* v. *Johnson,* 67 Tenn. (8 Baxt.), 265; *Gray* v. *Baird,* 72 Tenn. (4 Lea), 212; *Smith* v. *Neilson,* 81 Tenn. (13 Lea), 461; *Bradshaw* v. *Van Valkenburg,* 97 Tenn., 316, 37 S. W., 88.

But recently, the doctrine of subrogation has been more liberally applied.

In *Walker* v. *Walker,* 138 Tenn., 679, 200 S. W., 825, the court said:

"It is well settled that one who pays a debt with no intention at the time of keeping it alive, or being subrogated to the rights of the creditors and as a volunteer, is not entitled to subrogation. This general statement, however, is subject to many modifications. In so far as it embodies the principle that courts of equity will not grant relief unless payment was made upon some well-recognized principle of equity, it will harmonize with most of the cases. It is probable that all that is meant by the general rule is that, if a volunteer pays the debt of a third party, although it is a lien upon property, with the intention of extinguishing the debt, and is not induced thereto by fraud, accident, or mistake, or by contract with the payee, he is not entitled to subrogation."

In *Walker* v. *Walker,* the husband, a resident of Georgia without children, died intestate. Under Georgia laws, his wife would have inherited his real estate, and she supposed that his real estate in Tennessee would pass to her

as did his Georgia real estate. Under this mistake of fact she discharged a lien upon his Tennessee realty and was held, on the ground of mistake, to be entitled to subrogation to the lien she had discharged.

The substance of the holding in *Walker* v. *Walker,* is that, although there be no agreement for subrogation one who discharges a lien upon property under the mistaken belief that he will be substituted to the rights o' the lienholder with respect to such property, or one who accidentally discharges a lien upon property, or one who is induced by fraud to discharge a lien upon property—in all these cases the person paying off the lien is entitled to subrogation.

In *Harrison* v. *Harrison,* 149 Tenn., 601, 259 S. W., 906, 32 A. L. R., 563, the court notes the steady expansion of the doctrine of subrogation in its practical administration. In that case the court, however, found there was an agreement, in substance, that the lien paid off or the land would stand as security for the money advanced to discharge such incumbrance.

In *Dixon* v. *Morgan,* 154 Tenn., 389, 285 S. W., 558, a farmer purchased land of his neighbor, and as part of the consideration paid off vendor's lien notes. The land purchased also carried a mortgage subordinate to the vendor's lien. The purchaser did not know of this mortgage. Upon an extended review of the authorities, the court held the purchaser entitled to be subrogated to the rights of the holder of the vendor's lien. This on the ground of mistake.

There is a line of authorities which hold that, where a mortgage given to pay off a prior incumbrance turns out to be bad on account of defective title or defective execu-

tion, the holder of such mortgage is entitled to subrogation to the rights of the holder of the lien which the money advanced has been used to discharge. These authorities are apparently approved in *Milam* v. *Milam,* 138 Tenn., 686, 200 S. W., 826, and *Harris* v. *Fourth & First, etc., Land Bank,* 8 Tenn. App., 301. These decisions rest largely on the theory that it was the intention of the parties that the holder of the mortgage should have a lien on the land of equal dignity with the lien released by money he advanced. If this rule had application here, it could only apply to the Wehman building, for the mortgage executed by Mrs. Morgan disclosed that the parties only intended to incumber that much of the estate.

There can, however, be no lien accruing to the bank on the Wehman building by way of substitution to the rights of the man that put on the roof. Whatever lien that furnisher or mechanic had expired before this suit was brought. The roof was put on in 1930, and this bill was not filed until February 21, 1933. Code, sec. 7917. Moreover, the mechanic's lien arising out of a contract with Mrs. Morgan would doubtless be limited to her life estate.

Beyond this, the bank is not entitled to be substituted to the priority of any mechanic's lien or tax lien on any of the property. There was no such agreement, nor does any fraud, accident, or mistake appear.

It is plainly inferable from the bill of the bank herein that it knew the nature of Mrs. Morgan's title to the real estate passing under her husband's will when it made the loan and when it took the mortgage. The bill gives a detailed history of the title to the Wehman building and the reasons that induced the bank to make this loan and accept this trust deed, and then avers that the bank

"in good faith and under an honest belief (which it still has) that Mrs. A. B. Morgan had the right to borrow said money, execute said note, and execute said trust deed," paid to Mrs. Morgan said sum of money for the purpose of paying off said taxes, etc.

As we read the bill, the bank does not claim that it was mistaken or ignorant of the nature of Mrs. Morgan's title. On the contrary, the theory of the bill is that the bank knew this title and that Mrs. Morgan had the right to incumber the property. At any rate, the bill does not allege, and the record does not show, that the bank did not know the condition of Mrs. Morgan's title, and, in order for it to obtain relief by way of subrogation, on the ground of mistake, such a showing would be necessary. *Campbell* v. *Hamilton* (Tenn. Ch. App.), 39 S. W., 895, 898.

And finally, as noted in *Dixon* v. *Morgan, supra,* subrogation by way of relief from mistake will not be granted in equity, if the party seeking such relief has been guilty of culpable negligence. It seems to us that there can be no doubt that such negligence is to be imputed to the bank in this case. In *Dixon* v. *Morgan,* the court was considering the case of one farmer dealing with another, and granted relief to an unlettered man who had been mistaken about a title, although it was a record title. Here we are dealing with a national bank, authorized to act as the guardian of minor children, and so acting in this case; an institution belonging to that class which continually advertises the advantage and security of employing a corporate trustee. Mrs. Morgan's title was a matter of record. The chancellor had expressly decreed that she did not have the power to sell

and convey the property exchanged for this Wehman building. Title to the Wehman building was taken subject to the same limitations as title to the property for which it was exchanged. All this would have been disclosed by a casual inspection of this title. A guardian that lends its ward's money upon such security as did this guardian is guilty of such culpable negligence as to preclude any favor at the hands of a court of equity.

The decree of the chancellor is affirmed.

SWIGGART, J., did not participate in the consideration of this case.