CASTLEMAN CONSTRUCTION COMPANY et al.

*v.*

DR. EDNA PENNINGTON et al.

432 S.W.2d 669.

(*Nashville,* December Term, 1967.)

Opinion filed July 12, 1968.

Petition for Rehearing Denied October 25, 1968.

W. Raymond Denney and William D. Castleman, Nashville, for petitioners.

Charles H. Warfield and John Cabler Corbitt, Nashville, for respondents.

84

Stephenson, Lackey & Holman, Cornelius, Collins, Neal & Higgins, Goodpasture, Carpenter, Woods & Courtney, Nashville, Heiskell, Donelson, Adams, Williams & Wall, Memphis, for amicus curiae.

Mr. Chief Justice Burnett delivered the opinion of the Court.

The parties will hereinafter be referred to as they appeared in the trial court; that is, Castleman Construction Company, et al., complainants, and Dr. Edna Pennington and Ernest W. Colbert, defendants.

Castleman Construction Company filed suit against the defendants in the Chancery Court of Davidson County, seeking damages for breach of covenants of warranty

in a deed from defendants to the complainant. Other parties, who are not presently before this Court, were also named as defendants.

After one decree had been entered allowing the complainants to recover only nominal damages of one ($1.00) dollar, a petition to rehear was filed and granted and the complainant, Castleman Construction Company, was allowed to amend and supplement its original bill. The amended and supplemental bill added as parties complainant, Attorneys Title Company, Inc., as agent, and American Title Insurance Company. The case then proceeded under the original style for the use and benefit of the named title companies.

The case was thereafter heard on oral testimony and the entire record, and a judgment was entered against both defendants in the amount of $28,295.71, for the use and benefit of Attorneys Title Company, Inc., and the American Title Insurance Company. The defendants then perfected an appeal and argued the case before the Court of Appeals. That Court affirmed the judgment against the defendant, Colbert, but reversed the judgment against the defendant, Pennington, holding that the facts did not warrant a recovery by the insurance companies against this defendant on the theory of subrogation.

Both the complainants and the defendant, Colbert, have petitioned this Court to grant certiorari. The petition of the defendant, Colbert, is denied. We have granted the petition of the complainants and after hearing argument, reading the briefs and independently researching the problem, we are in a position to dispose of the case. The remainder of this opinion will be concerned with the

right of the complainant title companies to recover a judgment against Dr. Edna Pennington on the theory of subrogation. The case against the defendant, Colbert, will be discussed only as it relates to the liability of Dr. Pennington.

After reading the record we have adopted the statement of the pleadings and facts set forth in the opinion of the Court of Appeals, which statement reads as follows:

"As is stated in the Brief and Argument on behalf of the appellees, complainants below, the basic facts of this case with reference to defects in the title and the sum of money necessary to clear the same are generally not in dispute.

"The original bill alleges that the complainant, Castleman Construction Company, purchased twenty (20) lots comprising 'Rosebank Court subdivision' from the defendants, Dr. Pennington and Ernest W. Colbert, as co-owners and tenants-in-common, and that there were defects in the title to said property in that the defendants did not have title to Lot No. 1 and parts of Lots 2 and 3, and that there was a lien, or deed of trust, to Neill Brown, Trustee, to secure an indebtedness of defendant Colbert to Sheffield Clark, Jr.

"The bill further alleges that complainant was damaged in the amount it had expended to secure title to Lot No. 1 and parts of Lots 2 and 3 in the subdivision and to discharge the Sheffield Clark, Jr. indebtedness.

"After judgment for nominal damages was entered against the defendants and the petition to re-hear granted allowing the additional complainants to enter the case, these complainants, the Title Companies, alleged that

they had made certain payments for the benefit of complainant, Castleman Construction Company, to discharge the indebtedness of the defendant Colbert to Sheffield Clark, Jr., in the total amount of $22,053.55 and had paid to the complainant $4,100.00 in order to discharge a debt to the Small Business Administration in clearing up title to Lots 1, 2 and 3 in the Rosebank Subdivision. Said Title Companies allege that they should be subrogated to the rights of Castleman Construction Company to reimbursement from the defendants for money paid out by them because of encumbrances and/or defects in the title to the property on which they had issued a policy of title insurance.

'It is alleged and shown that the defendants, Pennington and Colbert, owned certain property as tenants-in-common and had conveyed part of this property to Castleman Construction Company by deed containing the usual covenants of warranty, said conveyance comprising some twenty (20) lots in the 'Rosebank Court Subdivision.'

"It is also shown that, as a further part of the consideration for this transaction it was contracted and agreed by the defendants that they would give Castleman Construction Company 'a title policy in the usual form, issued by Attorneys Title Company', which title letter was accompanied by the deed when it was delivered.

"After receiving the deed to these twenty lots and the title letter above mentioned, Castleman Construction Company commenced the construction of houses on the lots and invested large sums of money in construction and improvements thereon.

"It was then discovered that there was an outstanding lien, or encumbrance, as above mentioned, on part of Lots 2 and 3 and all Lots 4 through 20 in the subdivision, *which lien was the result of the defendant Colbert having conveyed by deed of trust his one-half undivided interest therein to Neill Brown, Trustee,* to secure an indebtedness to Sheffield Clark, Jr. Thus, Mr. Clark had a mortgage on the one-half interest of Colbert, and it developed that the Small Business Administration claimed an indebtedness of $4,100.00, secured by a lien on Lots No. 1, 2 and 3, Castleman Construction Company was notified to vacate and surrender these lots, or pay the indebtedness. Thereupon, the Title Companies furnished the money with which to pay off this indebtedness.

"It appears that Nelson Ladder and Manufacturing Company, a corporation wholly owned by defendant Colbert and some of his family, and controlled by him, had legal title to Lots 1, 2 and 3 and he had mortgaged them to the Small Business Administration to secure a debt of the company.

"The record shows that Dr. Pennington relied heavily on the defendant Colbert in the handling of the transactions concerning their joint property, Colbert being a tenant-in-common with her in the ownership of about 160 acres of land out of which the lots were sold to the complainant Castleman Construction Company.

"It seems clear that Dr. Pennington and her co-tenant Colbert did not execute the deed with warranty of title to Castleman Construction Company until after the title letter which they had ordered from the complainant, Attorneys Title Company, had been written showing the property was free of defects in title and of encumbrances.

"Of the two defects which occasioned this lawsuit, one arose because Ernest W. Colbert gave a deed of trust on his undivided one-half interest in the property to sesure an indebtedness to Sheffield Clark, Jr. and Dr. Pennington did not join in this deed of trust nor did she have any knowledge whatever of its existence.

"The other defect arose from the fact that the defendants did not own approximately two and one-half lots that were covered in the description in the deed to Castleman Construction Company but, as above stated, these lots were, in fact, owned by Nelson Ladder and Manufacturing Company which in turn was owned and/or controlled by defendant Colbert."

\* \* \* \* \* \*

"The defendants paid for a title letter issued by Attorneys Title Company dated July 27, 1961, which did not show the defects existing at the time in the title to the property and in addition to this, the title company issued a second letter dated April 17, 1962 again showing the property to be clear of encumbrances, and this was paid for by the defendants, Colbert and Pennington.

"Mr. Tom Gupton, an employee of Guaranty Title Company, testified that he examined the records pertaining to the property involved here and found that the title to two and one-half lots included in the conveyance were owned by Nelson Ladder and Manufacturing Company instead of the defendants, also the deed of trust from Colbert to Neill Brown, Trustee, all of which were in the records at the Register's Office in Davidson County, and which had been overlooked by the Attorneys Title Company."

In reaching the aforementioned conclusions, the Court of Appeals considered the nature of the doctrine of subrogation. A portion of their opinion reads as follows:

"It is stated in 83 C.J.S. 'Subrogation', Section 2, that the object of subrogation is to promote and accomplish justice and to prevent injustice. That it is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity and good conscience, should pay.

"In the early case of *Greenlaw, Executor v. Pettit* [*Pittit*] 87 Tenn. [467] [11 S.W. 357], in an opinion by Mr. Justice Lurton, one of the greatest judges in Tennessee history, it was said that the right of subrogation, being a pure equity, will be enforced only in favor of a meritorious claim, and where it can be done without injustice to the debtor and his other creditors.

"In [*Fecheimer-Keifer*] *v. Burton,* 128 Tenn. 682 [164 S.W. 1179, 51 L.R.A., N.S., 343] (688) the Court said:

" 'Since subrogation is a remedy invented by courts of equity, they will move to administer it where the result will be an equitable one, but not to work an injustice to another in the defeat of an equal equity.' "

The Court further stated that the doctrine of subrogation was to be enforced "only in favor of a meritorious claim where the equities and countervailing equities must be weighed." Thereafter, the Court proceeded to apply the principles of law, and with regard to the liability of the defendant, Dr. Pennington, stated:

"We think the equities (between Dr. Pennington and the insurance companies) weigh heavily in favor of Dr. Pennington and that judgment against Dr. Pennington in behalf of the Title Companies should not be affirmed."

In reaching this conclusion the court took several factors into consideration, some of those factors being that the title companies were negligent in failing to discover the encumbrances which had been placed upon the land sold and that the defendants did not own all the lots sold by them; that all the encumbrances were upon the defendant, Colbert's, interest in the property and that the defendant, Pennington, was unaware that the encumbrances existed; that the defendant, Pennington, relied upon Colbert to attend to the details concerning the development and sale of the property; that the defendants paid for the policy of title insurance issued by the complainant companies and that the sale of the property was not consummated until the complainant companies had run a title search and indicated by letter that the defendants had a clear title to the property.

Regarding the liability of the defendant, Colbert, the Court of Appeals in its opinion stated:

"As to the defendant, Ernest W. Colbert, the situation is different. Mr. Colbert knew he had placed a mortgage on his one-half undivided interest in the property, including that which was sold to Castleman Construction Company under a deed warranting title, and he knew, or was charged with the knowledge of the fact that Lot No. 1 and parts of Lots 2 and 3 belonged to Nelson Ladder and Manufacturing Company, which he and his family owned and controlled.

This is particularly true in view of the evidence that he directed the survey and the laying off of the lines which included the lots that were encumbered on behalf of said company.

"Thus, it was Colbert's debts that were paid off by the title companies after the defects in title were discovered, therefore, the assignments on behalf of defendant Colbert must be overruled."

We shall now consider the correctness of the decision of the Court of Appeals as it relates to Dr. Pennington. Several title insurance companies from throughout the State have filed briefs as amicus curiae, in which the position of the complainant title companies is defended. The position taken by the amicus curiae is that the covenants of warranty contained in the deed from the defendants to Castleman Construction Company are joint covenants, thereby making both defendants absolutely liable to Castleman Construction Company; that the title insurance policy issued by the complainant companies to Castleman Construction Company contained a subrogation clause; that this clause provided that if and when the title companies had to clear an encumbrance insured against, they would be subrogated to all the rights of Castleman Construction Company; that therefore, the subrogation under which the complainant title companies seek to recover is contractual or conventional subrogation and therefore is not governed by the usual tests which are applied in cases of legal subrogation. It is further insisted that the Court of Appeals overlooked these factors or gave them insufficient consideration.

The complainant title companies take essentially the same position as that of the amicus curiae, but also go a

step further and argue that even if we hold that the equities must be balanced, the equities weigh heavily in their favor rather than in favor of Dr. Pennington.

 It is thus essential that we first consider the nature of the doctrine of subrogation. In 83 C.J.S. Subrogation secs. 1 and 2, the following statements are found:

"Subrogation may be defined as the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt. * * *

"Subrogation does not owe its origin to statute or custom; nor is it a doctrine of the common law. It originated in equity and is a creature of equity, a doctrine of equity jurisprudence which was adopted by equity from the Roman or the civil law. * * *

"Subrogation is founded on principles of justice and equity, and its operation is governed by principles of equity. It rests on the principle that substantial justice should be attained regardless of form, that is, its basis is the doing of complete, essential, and perfect justice between all the parties without regard to form."

The following is found in Couch on Insurance 2d, Subrogation, sec. 61:18

"* * * Stated simply, subrogation is a creature of equity having for its purpose the working out of an equitable adjustment between the parties by securing the ultimate discharge of a debt by the person who in equity and good conscience should pay it."

And in sec. 61:20 of the same annotation it is stated:

"The doctrine of subrogation in insurance does not arise from, nor is it dependent upon, statute or custom or any of the terms of the contract; it has its origin in general principles of equity and in the nature of the insurance contract as one of indemnity. The right of subrogation rests not upon a contract, but upon the principles of natural justice.

"The principle of subrogation will be applied or not, according to the dictates of equity and good conscience, and to considerations of public policy, resting, as it does, upon the maxim that no one should be enriched by another's loss. In fact, subrogation is not a matter of strict right, nor does it necessarily rest on a contract, but is purely equitable in its nature, and will not be enforced when it would work injustice to the rights of those having equal equities."

It is further stated in sec. 16:21:

"To entitle one to subrogation, his equity must be strong and his case clear, since it will not be enforced where the equities are equal, or the rights are not clear, or where it will prejudice the legal or equitable rights of others. Where equities are equal, there is no right to subrogation. However, subrogation will not be enforced against superior equities."

This State is in agreement with the above principles. In addition to the cases previously cited in the opinion by the Court of Appeals, see *Elledge v. Sumpter,* 140 Tenn. 11, 203 S.W. 346 (1917), and *State ex rel. Moulton v. Holland,* 51 Tenn.App. 344, 367 S.W.2d 791 (1962).

We would agree with the complainants that the authorities do make a distinction between legal and conven-

tional subrogation. However, in essentially all the authorities which we have read the distinction is made in determining whether there is a right of subrogation in the first instance, rather than in the enforcement of such right. In other words, the distinction is made in determining the source of the right rather than in applying the remedy.

 The case of *Tennessee Farmers Mutual Insurance Company v. Rader,* 219 Tenn. 384, 410 S.W.2d 171 (1966), is relied upon by the complainants for the proposition that the equities are not to be weighed in conventional subrogation. In that case a policy of automobile liability insurance was issued to one, Gary Wayne Rader, a minor who resided with his parents, Mr. and Mrs. Paul Rader. The policy afforded medical payments up to $500.00 to or for him, his relatives, or any other person occupying the automobile, who sustained injuries caused by an accident.

Gary had an accident and asserted a claim against the driver of the other automobile for personal injuries, property damages and loss of wages. His father asserted a claim against the same party for loss of service and medical expenses. The insurance company paid to Mr. and Mrs. Rader and Gary $366.30, the amount of medical expenses incurred by Gary and notified all concerned that it claimed a right of subrogation against the owner and driver of the other automobile. The policy of insurance issued to Gary provided that the company would be subrogated to the rights of the insured. However, Mr. Paul Rader executed a subrogation agreement with the company whereby he agreed to indemnify the company to the extent of any payment which he recovered from the tortfeasors. Thereafter a settlement was reached between

Gary, his father and the driver of the other car, and the money paid into court. The insurance company sought to be subrogated to $366.30 of the funds on deposit in the court. The trial court denied subrogation and the Supreme Court in reversing stated:

"From the reading of the record it is evident the trial judge based his finding upon the subrogation clause of the insurance policy. That is, since the clause specifically subrogated the company to the insured's (Gary Rader) rights, the company had no right to be subrogated to the funds paid into court under the settlement agreement to satisfy Mr. Rader's claim for loss of services and medical expenses.

"The trial judge obviously overlooked the subrogation agreement executed by Mr. Rader to the Insurance Company on October 27, 1965.

"Subrogation given by agreement or stipulation is known as conventional subrogation. *United States Fidelity & Guaranty Company v. Elam,* 198 Tenn. 194, 278 S.W.2d 693 (1955).

" 'In conventional subrogation the extent of the right is measured by the agreement for subrogation, and by the rights of the person granting the right.' 83 C.J.S., Subrogation, sec. 4, page 587."

In other cases where the courts have distinguished between legal and conventional subrogation, they have done so for the purpose of showing that one who makes a payment under a contract calling for subrogation is not a mere volunteer, thereby relieving them from the rule that a volunteer is not entitled to subrogation. See *United States Fidelity & Guaranty Company v. Elam,* 198 Tenn. 194, 278 S.W.2d 693 (1955).

█ Although the authorities cited in the complainants' brief would indicate that a few jurisdictions might decide otherwise, we are of the opinion that the better rule is that regardless of the source of the right of subrogation, the right will only be enforced in favor of a meritorious claim and after a balancing of the equities.

A statement of the rule which we approve is found in the case of *Roberts et al v. Fireman's Insurance Company of Newark, N. J.*, 376 Pa. 99, 101 A.2d 747 (1954), wherein the Supreme Court of Pennsylvania stated:

"Moreover, subrogation is to be accorded upon equitable principles even though the right thereto, as authorized by statute in respect of policies of insurance, Act of April 25, 1945, P.L. 307, sec. 1, 40 P.S. sec. 657, is contractually declared. * * * 'Subrogation rests upon purely equitable grounds, and it will not be enforced against superior equities.' "

This brings us to a consideration of the second portion of the complainants' argument. As was previously stated, the Court of Appeals found that as between Dr. Pennington and the title companies, the equities weighed heavily in favor of Dr. Pennington. After a detailed review of the record, we find ourselves unable to agree with this conclusion. Admittedly the complainant title companies were negligent in failing to discover the defects in the defendants' title. It is argued on behalf of Dr. Pennington that this negligence precludes the complainant title companies from recovering under the theory of subrogation.

█ In 83 C.J.S. Subrogation sec. 6, it is said that culpable negligence may prevent one from being afforded

the equitable relief of subrogation. However, it is further stated:

"Negligence of the subrogee must be more than ordinary negligence, however, in order to bar application of the principle of subrogation, and relief may be allowed notwithstanding the suitor's mistakes and ignorance * * *"

In *Dixon v. Morgan*, 154 Tenn. 389, 285 S.W. 558 (1926), the question at hand was discussed wherein the court stated:

" 'As a second requisite, it has sometimes been said in very general terms that a mistake resulting from the complaining party's own negligence will never be relieved. This proposition is not sustained by the authorities. It would be more accurate to say that, where the mistake is wholly caused by the want of that care and diligence in the transaction which should be used by every person of reasonable prudence, and the absence of which would be a violation of legal duty, a court of equity will not interpose its relief; but even with this more guarded mode of statement, each instance of negligence must depend to a great extent upon its own circumstances. It is not every negligence that will stay the hand of the court.' "

■ We do not say that ordinary negligence of the subrogee may not be taken into consideration in ascertaining whether he be entitled to the equitable relief of subrogation. What we do say is that ordinary negligence alone will not be held as a complete bar to subrogation where in spite of such negligence the equities are still in favor of the subrogee.

██ In the instant case Dr. Pennington turned the complete management of the property in question over to her co-tenant Colbert. It can reasonably be inferred from Dr. Pennington's testimony that she would have followed his suggestions as to all aspects thereof. She testified that she didn't even recall signing the deed to Castleman, but that she must have done so, and that she would have signed an instrument presented to her by Colbert if he had informed her that the instrument was to convey the property in question. It would appear to be clear that Dr. Pennington was relying primarily upon the representations of Colbert, her co-tenant, rather than upon the representations of the title companies. It would also appear to us that having placed her complete trust in Colbert and having turned the complete management of the property over to him, Dr. Pennington must be bound by his actions which, if not fraudulent, were certainly grossly negligent.

██ The complainants have insisted that Colbert and Dr. Pennington were partners and that all the elements of the partnership are present in this case, thereby making Dr. Pennington liable for the acts of her partner which were performed within the scope of the partnership business. Counsel for Dr. Pennington argues that under Tennessee law, a partnership must be clearly pleaded if it is to be relied upon. We are of the opinion that regardless of which party is correct on this point of law, Dr. Pennington must share the responsibility for Colbert's act of conveying this property after placing mortgages thereon. She cannot benefit from Colbert's acts without sharing the responsibility. This is especially true in a court of equity where we are seeking to do justice to all parties regardless of form.

Dr. Pennington testified that she did not receive any of the $41,000.00 consideration paid by Castleman Construction Company for the property in question. However, the record shows that this money went back into property which she and Colbert owned for the purpose of developing roads and paying back taxes. Moreover, Dr. Pennington got the benefit of the $41,000.00 paid to clear the lots owned by the Nelson Ladder Company. It should be noted that these three lots were included in the deed to Castleman Construction Company. Also, as a result of the sale funds were made available for the payment of a mortgage to Associates Finance Corporation, shown in the title letter of Attorneys Title Company as being outstanding in the sum of $26,375.00.

In the light of the foregoing facts we believe that the equities are in favor of the complainant title companies and, therefore, the judgment of the Court of Appeals as it relates to Dr. Pennington is reversed.

Opinion on Petition to Rehear

Counsel for Dr. Pennington have filed herein a very forceful and dignified petition to rehear, wherein they raise five points, all of which were fully and thoroughly considered by us when the matter was originally submitted by argument and brief in this Court. This being true, there is really no new question raised herein which has not already been given full consideration by us. The petition to rehear, therefore, fails to comply with Rule 32 of this Court and various authorities cited there, such as *L. & N. RR. Co. v. U. S. Fidelity & Guaranty Co.*, 125 Tenn. 658, 148 S.W. 671, and Gilreath's History of a Lawsuit, 8th Ed., section 460, page 529. Regardless of this fact though and in view of the fact that this petition

to rehear is so interestingly worded and argued, we have again considered the matter and have checked the record as well as reading and re-reading the brief and argument herein.

It was true that this petition cites a case that was not originally cited, that of *Old National Bank v. Swearingen,* 167 Tenn. 529, 72 S.W.2d 545. However, in reading and studying this case we are satisfied that it is not in point herein. The *Swearingen* case deals with a fiduciary's duty to protect the estate of its ward where the bank had lent money without investigating the title. We are all familiar with the authorities, statutes, etc., as to the duty of a fiduciary in such instances, and know that clearly this would make a bank culpably negligent. In the instant case the title company contracted with the Castleman Construction Company and through its negligence overlooked certain liens, mortgages, etc., against the property that Pennington and Colbert sold to Castleman. When this was determined it was settled by the title company and the present litigation proceeded to determine who was entitled to be subrogated and whether or not Pennington was liable under the subrogation clauses, and it was on this question that we have determined that she was liable. After fully reviewing and studying this matter again in view of this petition we have not changed our mind but are more than ever certain that we are correct as was the Chancellor.

The petition likewise cites T.C.A. 61-106 with the argument made that wherein this statutory language states that tenants in common, because they are tenants in common, are not necessarily partners. In other words they are not made partners by being such. We did not mention this statute in our opinion but were familiar with

it and we in no wise intended by what we have said in our opinion to say that just because they are tenants in common they are partners and the liability of Pennington is based on a partnership proposition. Frankly, this is such a close question it could probably be held they were partners but it is not necessary under the factual situation herein.

This whole case may be simplified by stating it thus: if there had been no title insurance Pennington and Colbert would have been liable to Castleman under their warranty deed for the very things the title company overlooked, and as between Pennington and Colbert she would have had it all to pay and looked to him for his part (there is a final judgment herein against Colbert). This would have been true because he made the debts and did the wrong. Pennington's signing the deed is in no way chargeable to the title company (she did not rely on them—she placed her complete reliance on Colbert). This being true, under the various quotes in the original opinion on subrogation, it places the onus on Dr. Pennington.

The title insurance was not made for or to her. It was for Castleman's protection and the liability of the company was to Castleman. Pennington's want of care and diligence and her complete trust in Colbert was her downfall and demands that the equity principles be applied as set forth in the original opinion in subrogating this judgment against her and in favor of the title company.

Thus it is after having fully considered this matter again, we feel, and have no hesitancy in our feeling, that our judgment is correct under the law and the facts of this case and that Dr. Pennington should bear the burden

of the mortgages, etc., which the title company had to pay off due to their title letter to Castleman, which arrives at the judgment as entered by the Chancellor plus interest from that time on. Interest normally follows the principle unless there is some excellent reason to the contrary. We see no such reason here. Thus it is the petition to rehear must be, and is, overruled.