**ACUITY, A Mutual Insurance Company**

v.

**McGHEE ENGINEERING, INC. et al.**

Court of Appeals of Tennessee, at Nashville.

Aug. 7, 2008 Session.

Dec. 15, 2008.

Permission to Appeal Denied by Supreme Court Aug. 17, 2009.

Michael E. Collins, Nashville, Tennessee; Lawrence R. Moelmann, Chicago, Illinois; and W. Timothy Harvey, Clarksville, Tennessee; for the appellant, Acuity, A Mutual Insurance Company.

David N. Garst and Ronald B. Deal, Jr., Nashville, Tennessee, for the appellee, McGhee Engineering, Inc.; Jefferson C. Orr and Matthew J. DeVries, Nashville, Tennessee, for the appellee, Strand Associates, Inc., d/b/a PEH Engineers; and Dan L. Nolan and Philip M. Mize, Clarksville, Tennessee, for the appellee, E. Berkley Traughber & Associates, Inc.

## OPINION

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., joined. PATRICIA J. COTTRELL, P.J., M.S., not participating.

A surety filed suit against three engineering firms seeking to recover some of the surety's losses on a project. The trial court granted summary judgment in favor of the engineers. We have concluded that the surety does have a right of action against the engineers based upon equitable subrogation and that the surety's claims are not barred by res judicata or collateral estoppel. Because the consulting engineer had no contract with the project owner, the trial court did not err in granting summary judgment on contract claims against the consulting engineer. In all other respects, we reverse the trial court's decision.

## FACTUAL BACKGROUND

The dispute in this case arose out of the construction of a raw water intake and pumping station on the Cumberland River in Clarksville, Tennessee. The Logan Todd Regional Water Commission ("Logan Todd"), a special district created under Kentucky law that supplies water to three Kentucky counties, undertook the project. Logan Todd retained McGhee Engineering, Inc. ("McGhee") as the project engineer. McGhee retained Strand Associates, Inc. d/b/a/ PEH Engineers ("Strand") as consulting and design engineers. Logan Todd also retained E. Berkley Traughber & Associates, Inc. ("Traughber") as the geotechnical engineer for the project. Logan Todd entered into a contract with Peters Contracting, Inc. ("Peters") to be the general contractor on the project. In accordance with the contract between Peters and Logan Todd, Peters obtained a performance bond and a payment bond, which were issued by Acuity, A Mutual Insurance Company ("Acuity").[1] Peters subcontracted with Tri–State Marine Con-

struction ("Tri–State") to perform the marine construction work. Tri–State was to install pipelines in the bed of the river. Peters entered into a subcontract with Capitol Tunneling, Inc. ("Capitol") to bore underground tunnels and install pipelines from the pumping station to the river embankment. The underground pipelines would connect to the underwater pipelines, allowing Logan Todd to pump water from the river to a reservoir or shore well near the pumping station.

Drawing 25, prepared by Strand and issued by McGhee, showed two parallel tunnels running from the base of the shore well and extending underground about 210 feet from the shore well. During construction, Peters advised McGhee and Strand of its desire to extend the tunnels only 190 feet from the shore well. The engineers, who now argue that this decision was a "means and methods" issue left to Peters's discretion, did not object. Peters proceeded to extend the tunnels only 190 feet from the shore well. On October 10, 2002, as Tri–State was excavating into the river embankment to connect the underwater tunnels with the underground tunnels, the river embankment began sloughing. At this point, McGhee contacted Traughber, the geotechnical engineer, to discuss appropriate action to stop the sloughing and allow the project to continue. Based upon Logan Todd's desire to continue the work, Traughber recommended putting tarps on the embankment to give Tri–State a few more weeks to finish its work. On February 27, 2003, a large portion of the embankment collapsed into the river.

Logan Todd declared Peters to be in default under the contract for failing to perform the work in accordance with the

1. The bonds list Heritage Mutual Insurance Company as the surety. Heritage later changed its name to Acuity.

contract documents and failing to adhere to the project progress schedule. Logan Todd made a claim under the performance bond for Acuity to complete the project, and Acuity made arrangements with another contractor to complete the work. At the time of Peters's termination, there was less than $400,000 to be paid out of the total contact amount of $3,740,000. Acuity spent over $3,000,000 to complete the contract and satisfy claims under its bonds.

## Tri–State Litigation

In April 2003, Tri–State filed suit against Acuity in federal district court asserting a claim under the payment bond.[2] Acuity filed a third-party complaint against Logan Todd, Capitol, and Peters Leasing Co. In February 2005, the federal district court denied Acuity's request to join the engineers, McGhee, Strand, and Traughber, as third-party defendants. Acuity settled with Tri–State concerning its claims in October 2005. In May 2006, Acuity and Logan Todd entered into a settlement agreement concerning claims under the performance bond.

## Current Litigation

Acuity filed the instant lawsuit in March 2005 against McGhee, Strand, and Traughber (collectively, "Engineers"). Its original complaint included the assertion that Acuity was equitably subrogated to the rights of Logan Todd and alleged that Engineers were liable for negligent misrepresentation. Acuity filed an amended complaint in January 2007 in which it added claims for negligent preparation and issuance of plans and specifications, breach of Engineers' contractual obligations to Logan Todd, and breach of obligations to the surety. After answering the amended

complaint, Engineers filed motions for summary judgment. In granting these motions, the chancellor found that Acuity had "no right of action under the doctrine of equitable subrogation against the defendant engineers under the facts of this case" and that Acuity's claims were barred by res judicata and/or collateral estoppel. The court further found that Acuity's negligent misrepresentation claim failed as a matter of law because there was no justifiable reliance by Acuity on information supplied by Engineers.

## STANDARD OF REVIEW

Summary judgments do not enjoy a presumption of correctness on appeal. *Bell-South Adver. & Publ'g Co. v. Johnson,* 100 S.W.3d 202, 205 (Tenn.2003). This court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown,* 955 S.W.2d 49, 50 (Tenn.1997). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn.2002). When reviewing the evidence, we must determine whether factual disputes exist. If a factual dispute exists, we must determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall,* 847 S.W.2d 208, 211 (Tenn.1993); *Rutherford v. Polar Tank Trailer, Inc.,* 978 S.W.2d 102, 104 (Tenn. Ct.App.1998). Under Tenn. R. Civ. P. 56, the moving party must negate an element of the opposing party's claim or establish an affirmative defense. *Byrd,* 847 S.W.2d at 215 n. 5.

---

**2.** *Tri–State Marine Constr. LLC v. Heritage Mut. Ins. Co.,* Civil Action No. 3–03–0344

(M.D. Tenn. filed Apr. 18, 2003).

ANALYSIS

I.

*Equitable subrogation*

■ The first, and most difficult, issue to be addressed is whether Acuity is entitled to be subrogated to the rights of Logan Todd, thereby giving Acuity the right to assert Logan Todd's claims against Engineers. By virtue of Acuity's performance of Peters's contractual obligation to Logan Todd, Acuity claims it should be equitably subrogated to Logan Todd's position and, therefore, be able to sue Engineers for errors that allegedly contributed to Acuity's losses in having to complete the contract for Peters. Engineers argue that Acuity is entitled to be subrogated to the rights of the party whose debt it paid, which they assert is its principal, Peters, and not Logan Todd.

■ Tennessee applies the doctrine of equitable subrogation. *Bankers Trust Co. v. Collins,* 124 S.W.3d 576, 579 (Tenn.Ct. App.2003). Equitable subrogation " 'does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect.' " *Hartman v. State,* No. M2002–01430–COA–R3–CV, 2003 WL 1872648, *6 (Tenn.Ct.App. Apr.14, 2003) (quoting 83 C.J.S. *Subrogation* § 4 (2000)). The purpose of equitable subrogation has been described as follows:

> It is an equitable doctrine designed to obtain substantial justice and to prevent

wrongdoing. It arises when a person, even if for his own benefit, pays a debt for which another is also liable. The Tennessee Supreme Court has held that an insurer was subrogated to the rights its insured had against others when the insurer paid its insured's claim.

*Almany v. Nationwide Ins. Co.,* No. 85–341–II, 1987 WL 4745, *4 (Tenn.Ct.App. Jan.29, 1987) (citations omitted). Equitable subrogation is based on the principle that " 'substantial justice should be attained regardless of form, that is, its basis is the doing of complete, essential, and perfect justice between all the parties without regard to form.' " *Castleman Constr. Co. v. Pennington,* 222 Tenn. 82, 432 S.W.2d 669, 674 (1968) (quoting 83 C.J.S. *Subrogation* §§ 1–2).

We must now examine the principles of equitable subrogation and their application in the context of performance bonds.[3] A performance bond is "[a] third party's agreement to guarantee the completion of a construction contract upon the default of the general contractor." BLACK'S LAW DICTIONARY 1174 (8th ed.2004). Acuity agreed to assure Logan Todd of the completion of the project if Peters defaulted.[4] The bond's obligation runs to Logan Todd, the owner. If the engineers violated a duty to Logan Todd that at least partially caused Acuity to have to expend funds under the surety agreement, it would seem that "the doing of complete, essential, and perfect justice between all the parties" would al-

---

3. Acuity's claims against Engineers are based upon its performance bond. Courts have recognized that a surety's rights under a performance bond, requiring the surety to complete the contract in the event of the principal obligor's default, can differ from those under a payment bond, requiring a surety to pay claims from laborers and materialmen. *See Nat'l Fire Ins. Co. v. Fortune Constr. Co.,* 320 F.3d 1260, 1269–70 (11th Cir.2003); *Third Nat'l Bank in Nashville v. Highlands Ins. Co.,*

603 S.W.2d 730, 733 (Tenn.1980) (discussing equitable subrogation in the context of payment bonds); 4 Philip L. Bruner & Patrick J. O'Connor, Jr., BRUNER AND O'CONNOR ON CONSTRUCTION LAW § 12.99 (May 2008).

4. There is no dispute in this case that Peters was in default and that Acuity was contractually obligated to finish Peters's contract with Logan Todd.

low Acuity to be able to sue Engineers.[5] *Castleman*, 432 S.W.2d at 674.

■ In a suretyship relationship, Party O, the obligee or creditor, enters into an agreement with Party P, the primary obligor, for the performance of certain services. RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY § 1 (1995). Party S, the surety or secondary obligor, agrees to complete performance of the contract in the event of the default of Party P, the surety's principal. *Id.* The general principles of equitable subrogation have been summarized as follows:

> [A] surety or guarantor, by payment of the debt of his principal when he is obligated to make that payment, acquires an immediate right to be subrogated to the extent necessary to obtain reimbursement or contribution to all rights, remedies and securities which were available to the creditor to obtain payment from the person or property of any person who, as to the surety, is primarily liable for the debt.

*Ottenheimer Publ., Inc. v. Regal Publ., Inc.*, 626 S.W.2d 276, 281 (Tenn.Ct.App. 1981). Thus, the surety is entitled to step into the shoes of the creditor. *See Castleman*, 432 S.W.2d at 674; *Maryland Cas. Co. v. McConnell*, 148 Tenn. 656, 257 S.W. 410, 412 (1924); *see also* RESTATEMENT (THIRD) OF SUR. & GUAR. § 27. By completing a project on behalf of its defaulting principal, a surety "confer[s] a benefit on the obligee and, therefore, step[s] into the shoes of the obligee." *Nat'l Fire Ins. Co. v. Fortune Constr. Co.*, 320 F.3d 1260, 1270 (11th Cir.2003). In our example, then, Party S would stand in the shoes of Party O.

Application of these principles to the case at issue supports Acuity's position that it should stand in the shoes of Logan Todd. Acuity (Party S), having performed in the event of the default of Peters (Party P) and satisfied all claims due to Logan Todd (Party O), is subrogated to the rights of Logan Todd.

There appear to be no Tennessee cases involving the particular type of surety claim in this case—namely, a surety subrogating to the rights of the obligee/creditor to seek damages from a third party. The Restatement, however, contemplates such an action:

> To the extent that the secondary obligor is subrogated to the rights of the obligee, the secondary obligor may enforce, for its benefit, the rights of the obligee as though the underlying obligation had not been satisfied:
>
> (a) against the principal obligor pursuant to the underlying obligation;
>
> (b) against any other secondary obligor. . . .
>
> (c) against any interest in property securing either the obligation of the principal obligor or that of any other secondary obligor. . . .
>
> (d) *against any other persons whose conduct has made them liable to the obligee with respect to the default on the underlying obligation.*

RESTATEMENT (THIRD) OF SUR. & GUAR. § 28 (emphasis added).

Moreover, there are cases from other jurisdictions involving facts similar to those at issue in this case in which the surety has been allowed to subrogate to the rights of the owner and pursue a claim against a third party. In *Lyndon Property Insurance Co. v. Duke Levy &*

---

**5.** The issue presented in this case appears to be unusual because the rights sought by Acuity here would typically have been acquired by contractual assignment from the owner, Logan Todd, when Logan Todd and Acuity entered into a settlement.

*Associates, LLC,* the owner terminated the contractor and the surety funded the completion of the project pursuant to its performance bond. *Lyndon Prop.,* 475 F.3d 268, 270 (5th Cir.2007). The surety filed suit against the project engineer for negligence, breach of contract, and breach of warranty under the doctrine of equitable subrogation. *Id.* at 270. The court explained the principles of equitable subrogation as follows:

> Equitable subrogation is a doctrine whereby a surety is permitted to stand in the shoes of the party that benefitted from its performance of the surety obligation in order to prevent unjust enrichment on the part of a wrongdoer who caused the surety's expense.

*Id.* at 270–71 (citing *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 136, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962)). Since the surety paid the project expenses, the court determined that the surety could stand in the shoes of the owner. *Id.* at 271. The owner did not suffer a loss because the surety, not the owner, had paid the costs of the project engineer's alleged negligence. *Id.* Engineers in the present case attempt to distinguish *Lyndon* from this case on the basis that *Lyndon* was decided under Mississippi law. The principles of equitable subrogation, however, are principles of equity, and the engineers have not identified any relevant differences between Mississippi law and Tennessee law. *See also Carolina Cas. Ins. Co. v. R.L. Brown & Assoc., Inc.,* No. Civ.A. 1:04–CV–3537, 2006 WL 3625891, * 10 (N.D.Ga. Dec.11, 2006) (subrogated surety can pursue claim against project architect for wrongful certification of payments); *Commercial Standard Ins. Co. v. Bank of America,* 57 Cal.App.3d 241, 129 Cal.Rptr. 91, 94 (1976) (surety subrogated to owner's right of action against bank for negligent disbursement of loan proceeds); *Unity Tel. Co. v. Design Serv. Co.,* 160 Me. 188, 201 A.2d 177, 179 (1964)

(surety subrogated to obligee's right of action against the supervising engineering firm).

Engineers point to two unreported cases to support their argument that Acuity should not be subrogated to Logan Todd's rights. We find these cases to be distinguishable and unpersuasive. In *Mid–State Surety Corp. v. Thrasher Engineering, Inc.,* No. Civ.A. 2:04–0813, 2006 WL 1390430, *8 (S.D.W.Va. May 16, 2006), the court found that the engineer owed a direct duty of care to the surety; thus, the surety could maintain a direct claim against the engineer and did not have to rely on subrogation rights. The court went on to conclude that, "[i]nasmuch as Mid–State [the surety] has not paid any of the debts of the District [owner/obligee], its claim that it is equitably subrogated to the District's rights fails." *Mid–State,* 2006 WL 1390430, at *9. The court noted that "[t]he parties cite no suretyship law to support their divergent positions." *Id.* While citing caselaw setting forth the rule that the surety who pays the debt of another is entitled to exercise the creditor's remedies, the court erroneously focused on whether the surety had satisfied any debts of the District/obligee. *Id.* As discussed above, the proper analysis is whether the surety fully satisfied its principal's debts to the obligee. This confers a benefit on the obligee and justifies the equitable subrogation. *Nat'l Fire,* 320 F.3d at 1270.

In the other case cited by Engineers, *ECOR Solutions, Inc. v. Malcolm Pirnie, Inc.,* No. 1:02CV01103NAMDRH, 2005 WL 1843253, *17 (N.D.N.Y. July 29, 2005), the court denied a motion to amend the plaintiff/contractor's complaint to add a claim based upon the surety's subrogation to the rights of the obligee. The surety had assigned its right of action against the defendant/project managers to the plaintiff. *ECOR,* 2005 WL 1843253, at *17.

While we believe that the court in *ECOR,* like the court in *Mid–State,* based its conclusion on a misapprehension of the principles of equitable subrogation, we also note that the court denied a motion to dismiss the plaintiff/contractor's claim against the defendant/project managers for negligent misrepresentation. *Id.* at *6. Thus, the plaintiff was entitled to pursue an action directly against the defendant.

We have concluded that Acuity is entitled to be subrogated to the rights of Logan Todd against the engineers. The ultimate success or failure of Acuity's subrogated claims will depend upon the relevant facts and the equities between the parties. *See Castleman,* 432 S.W.2d at 674–75.

## II.

### *Propriety of summary judgment regarding equitable subrogation*

Engineers assert that even if Acuity is entitled to be subrogated to the rights of Logan Todd, Engineers were entitled to summary judgment based upon a variety of arguments [6] that we will group into three categories: (A) arguments based upon subrogation principles; (B) arguments based upon the relevant contract terms; and (C) arguments based upon Acuity's failure to contest the trial court's dismissal of its negligent misrepresentation claims.

#### (A) Subrogation arguments

Engineers argue that Acuity's subrogation claims are invalid because Acuity satisfied the obligations of Peters not Logan Todd; because Peters's failure to complete the project relieves Engineers from liability for not performing their professional duties; because Logan Todd did not itself assert any claims against Engineers and maintains that they performed properly under the contracts; because Acuity cannot recover the losses it claims, which are its own losses and not those of Logan Todd, its subrogee; and because Acuity's subrogation claims against Traughber must fail under a balancing of the equities.

For the most part, these arguments are based upon erroneous assumptions about the nature of equitable subrogation. As discussed in part I above, equitable subrogation allows the secondary obligor/surety to step into the shoes of the obligee, Logan Todd. It is precisely because Peters defaulted, thereby obligating Acuity to complete the project, that Acuity is now entitled to step into the shoes of Logan Todd and pursue its rights against third parties. The fact that Logan Todd chose not to pursue such claims does not prevent Acuity from being able to do so. Acuity prevented Logan Todd from incurring losses by performing its duties under the performance bond. To argue that Acuity cannot recover for its losses contravenes a fundamental concept underlying equitable subrogation: "By definition, the party into whose shoes the surety steps has not suffered a loss because the surety protected it from that loss." *Lyndon,* 475 F.3d at 271. Thus, Acuity is entitled to recover its losses by stepping into Logan Todd's shoes and asserting claims against third parties.[7]

6. Engineers filed separate briefs with differing arguments. We have combined the arguments of all three engineers in this summary.

7. We do not consider the resolution passed by the Logan Todd Regional Water Commission asserting the commission's satisfaction with

Engineers' performance on the project to have any bearing on Acuity's rights as subrogee to Logan Todd.

■ Traughber asserts that summary judgment was appropriate as to Acuity's claims against Traughber because the equities favor Traughber. Under Tennessee law, equitable subrogation "will not be enforced where the equities are equal, or the rights are not clear, or where it will prejudice the legal or equitable rights of others." *Collins,* 124 S.W.3d at 579; (quoting *Castleman,* 432 S.W.2d at 675). A balancing of the equities, however, is necessarily a fact-intensive inquiry, and as will be discussed more fully below, there remain significant factual disputes in the present case.

### (B) Contract arguments

■ In interpreting a contract, we seek to ascertain the intent of the parties from the language of the contract; in so doing, we must apply to those words their usual, natural, and ordinary meaning. *Staubach Retail Servs.-SE, LLC v. H.G. Hill Realty Co.,* 160 S.W.3d 521, 526 (Tenn.2005). If the terms of a contract are unambiguous, a court must determine the intent of the parties as expressed in the four corners of the contract. *Rogers v. First Tennessee Bank Nat'l Ass'n,* 738 S.W.2d 635, 637 (Tenn.Ct.App.1987). The interpretation of a contract is a question of law; therefore, our review is de novo with no presumption of correctness. *Allstate Ins. Co. v. Watson,* 195 S.W.3d 609, 611 (Tenn.2006).

Acuity summarizes its claims against Engineers as follows:

1. McGhee and Strand failed to raise appropriate objections when Peters advised of its intention to extend the tunnels only 190 feet from the Shore Well, which was contrary to the design concept as stated on Drawing No. 25. . . .

2. McGhee, Strand and Traughber breached their obligations as engineers on the Project when the Embankment collapsed in October, 2002. The Defendants only recommended that tarps be placed on the Embankment instead of considering and recommending that other actions be taken to address the stability of the Embankment.[8]

Engineers point to various provisions of the relevant contracts as preventing them from being held liable to Logan Todd/Acuity. We address the claims against each engineer separately below.

■ *McGhee,* project engineer. Logan Todd entered into a contract with McGhee to perform engineering services for the project. The Logan Todd/McGhee contract contains the following pertinent provisions:

11. The ENGINEER [McGhee] will interpret the intent of the drawings and specifications to protect the OWNER [Logan Todd] against defects and deficiencies in construction on the part of the contractors [Peters]. The ENGINEER will not, however, guarantee the performance by any contractor.

. . .

13. The ENGINEER will provide general engineering review of the work of the contractors as construction progresses to ascertain that the contractor is conforming with the *design concept.*

14. Unless notified by the OWNER in writing that the OWNER will provide for resident inspection, the ENGINEER will provide resident construction inspection. The ENGINEER's undertaking hereunder shall not relieve the contractor of contractor's obligation to perform the work in conformity with the drawings and specifications and in a workmanlike manner; shall not make

---

**8.** The negligence aspects of these claims will be addressed in subsection (C) below.

the ENGINEER an insurer of the contractor's performance, and shall not impose upon the ENGINEER any obligation to see that the work is performed in a safe manner.

(Emphasis added). McGhee rightly concludes that, under these provisions, McGhee was not the guarantor or insurer of Peters's performance and that Peters had an obligation to properly perform its work in accordance with the drawings and specifications. That conclusion does not, however, absolve McGhee of any responsibility for the proper performance of its own contractual duties.

Some provisions of the contract between Logan Todd and Peters address the role of the project engineer. The Logan Todd/Peters construction agreement is a voluminous contract with multiple parts, including Standard General Conditions.[9] The contract provides that McGhee "is to act as OWNER's representative, assume all duties and responsibilities, and have the right and authority assigned to ENGINEER in the Contract Documents in connection with completion of the Work in accordance with the Contract Documents." Peters made a number of representations "in order to induce OWNER to enter into this Agreement." These included representations that Peters had carefully examined the plans, familiarized itself with the physical conditions, studied the available technical data, and undertaken whatever investigation it considered necessary to complete the project.

The General Conditions section of the contract, which is over 40 pages long, fleshes out the roles and relationships of the project owner, the contractor, the project engineer, and the engineer's consul-

tant (Strand). Pursuant to Article 8, "OWNER shall issue all communications to CONTRACTOR through ENGINEER." Article 6 describes the contractor's responsibilities and includes the following pertinent provisions:

6.01 Supervision and Superintendence

A. CONTRACTOR shall supervise, inspect, and direct the Work competently and efficiently.... CONTRACTOR shall be solely responsible for the means, methods, techniques, sequences, and procedures of construction, but CONTRACTOR shall not be responsible for the negligence of OWNER or ENGINEER in the design or specification of a specific *means, method,* technique, sequence, or procedure of construction which is shown or indicated in and expressly required by the Contract Documents....

. . . .

6.06 Concerning Subcontractors, Suppliers, and Others

. . . .

C. CONTRACTOR shall be fully responsible to·OWNER and ENGINEER for all acts and omissions of the Subcontractors, Suppliers, and other individuals or entities performing or furnishing any of the Work just as CONTRACTOR is responsible for CONTRACTOR's own acts and omissions. Nothing in the Contract Documents shall create for the benefit of any such Subcontractor, Supplier, or other individual or entity any contractual relationship between OWNER or ENGINEER and any such Subcontractor, Supplier, or other individual or entity....

---

9. The Standard General Conditions of the Construction Contract, Funding Agency Edition, is a document issued and published by the National Society of Professional Engineers, American Consulting Engineers Council, and the American Society of Civil Engineers.

6.19 CONTRACTOR's General Warranty and Guarantee

. . . .

B. CONTRACTOR's obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute. None of the following will constitute an acceptance of Work that is not in accordance with the Contract Documents or a release of CONTRACTOR's obligation to perform the Work in accordance with the Contract Documents:

1. Observations by ENGINEER. . . .

Article 9 of the General Conditions describes the status of the engineer, McGhee, and contains the following pertinent provisions:

9.02 Visits to Site

A. ENGINEER will make visits to the Site at intervals appropriate to the various stages of construction as ENGINEER deems necessary in order to observe as an experienced and qualified design professional the progress that has been made and the quality of the various aspects of CONTRACTOR's executed Work. Based on information obtained during such visits and observations, ENGINEER, for the benefit of OWNER, will determine, in general, if the Work is proceeding in accordance with the Contract Documents. ENGINEER will not be required to make exhaustive or continuous inspections on the Site to check the quality or quantity of the Work. ENGINEER's efforts will be directed toward providing for OWNER a greater degree of confidence that the completed Work will conform generally to the Contract Documents. On the basis of such visits and observations, ENGINEER will keep OWNER informed of the progress of the work and will endeavor to guard OWNER against defective Work.

B. ENGINEER's visits and observations are subject to all the limitations on ENGINEER's authority and responsibility set forth in paragraph 9.10, and particularly, but without limitation, during or as a result of ENGINEER's visits or observations of CONTRACTOR's Work ENGINEER will not supervise, direct, control, or have authority over or be responsible for CONTRACTOR's *means, methods*, techniques, sequences, or procedures of construction, or the safety precautions and programs incident thereto, or for any failure of CONTRACTOR to comply with Laws and Regulations applicable to the performance of the Work.

. . . .

9.10 Limitations on ENGINEER's Authority and Responsibilities

A. Neither ENGINEER's authority or responsibility under this Article 9 or under any other provision of the Contract Documents nor any decision made by ENGINEER in good faith either to exercise or not exercise such authority or responsibility or the undertaking, exercise, or performance of any authority or responsibility by ENGINEER shall create, impose, or give rise to any duty in contract, tort, or otherwise owed by ENGINEER to CONTRACTOR, any Subcontractor, any Supplier, any other individual or entity, or to any surety for or employee or agent of any of them.

B. ENGINEER will not supervise, direct, control, or have authority over or be responsible for CONTRACTOR's *means, methods*, techniques, sequences, or procedures of construction, or the safety precautions and programs incident thereto, or for any failure of CONTRACTOR to comply with Laws and Regulations applicable to the perform-

ance of the Work. ENGINEER will not be responsible for CONTRACTOR's failure to perform the Work in accordance with the Contract Documents.

(Emphasis added). Article 9 also authorized McGhee, as project engineer, to provide "written clarifications or interpretations of the requirements of the Contract Documents," to "authorize minor variations in the Work from the requirements of the Contract Documents," to "disapprove or reject Work which the ENGINEER believes to be defective," and "to require special inspection or testing of the Work."

Under Article 14 of the General Conditions, the contractor was to submit applications for payment to the project engineer, who would review each application and either present it to the owner for payment or return it to the contractor with reasons for refusing to recommend payment. The project engineer's recommendations constituted the engineer's representation that, based upon his observations on the work site and review of the application, "the quality of the Work is generally in accordance with the Contract Documents."

As authorized by the contract between Logan Todd and Peters, McGhee designated a resident project representative, and Logan Todd agreed to pay additional fees to McGhee for full-time resident inspection. The Supplementary Conditions section of the contract[10] between Logan Todd and Peters sets out the duties and responsibilities of the resident project representative and provides that the resident project representative "shall not authorize any deviation from the Contract Documents or substitutions of materials or equipment." We interpret the latter provision to mean that the resident project representative could not unilaterally authorize deviations

from the contract documents. Pursuant to the General Conditions, however, the project engineer, McGhee, was authorized to clarify or interpret the contract documents and authorize minor deviations from their requirements.

Engineers cite the exculpatory language of Section 9.10(A) as preventing any liability on the part of Engineers to Acuity for good faith actions since that section refers to the "Contractor, any Subcontractor, any Supplier, any other individual or entity, or to any surety for or employee or agent of any of them." Section 9.10(A) does not, however, mention liability to the owner, Logan Todd. Since Acuity is subrogated to the rights of Logan Todd, this exculpatory language does not apply. See Lyndon, 475 F.3d at 273.

McGhee also argues that the contractual provisions regarding the duties of the project engineer and the contractor warrant summary judgment in its favor. What, then, do these various contract provisions indicate about the division of responsibilities between Peters and McGhee? As contractor, Peters was responsible for the "means and methods" of construction. As project engineer, McGhee was responsible for the "design concept" and not for supervision and control of the contractor's means and methods. McGhee asserts that "[i]t is undisputed that Peters failed to supervise and superintend the Project in a proper manner by developing appropriate means, methods, techniques, sequences and procedures of construction." We respectfully disagree with this statement. The real issue here is the proper categorization of the actions that Acuity alleges constituted a breach of contract—the decision as to how far to extend the underground tunnels from the shore well and

10. The Logan Todd/Peters construction contract expressly provides that the Supplementary Conditions section has precedence over the General Conditions.

the decision regarding appropriate remedial action after the initial embankment slide in October 2002.

Drawing 25, prepared by Strand as McGhee's design consultant, calls for the tunnels to extend about 210 feet from the shore well. Acuity asserts that Peters advised McGhee that the contractor was considering extending the shore well only 190 feet and that McGhee did not object to this idea. McGhee asserts that Peters never asked for a written interpretation and that the appropriate tunnel length constituted a means and methods decision and was, therefore, the responsibility of Peters. As to the remediation of the embankment slide, Acuity asserts that the engineers should have recommended more effective ways to prevent further collapse. McGhee counters that Peters was responsible for knowing the soil and subsurface conditions and for doing its work in ways that would protect the safety of the embankment. Both sides have submitted expert and fact testimony in the form of affidavits and depositions to support their positions. There are material factual disputes, and the contract terms alone do not resolve the issues as to the viability of Acuity's contract claims against McGhee. Thus, summary judgment is not appropriate. *See generally U.R.S. Co., Inc. v. Gulfport–Biloxi Reg'l Airport Auth.*, 544 So.2d 824, 826 (Miss.1989) (contractual provisions similar to those in the present case; architect breached duty to owner to properly inspect contractor's work).

 *Strand,* **design engineer.** Strand was hired by McGhee, not by Peters.[11] We must, therefore, look to the relevant provisions of the contract between McGhee and Strand entitled "Standard Form of Agreement Between Engineer and Consultant for Professional Services." Like the construction agreement between Logan Todd and Peters, the McGhee/Strand contract provides that Strand "shall not supervise, direct or have control over the Work, nor shall Consultant have authority over or responsibility for the means, methods, techniques, sequences or procedures of construction selected by Contractor." The McGhee/Strand agreement further provides that Strand "neither guarantees the performance of Contractor nor assumes responsibility for Contractor's failure to furnish and perform the Work in accordance with the Contract Documents." The contract also contains the following provisions:

Unless expressly provided otherwise in this Agreement:

1. Nothing in this Agreement shall be construed to create, impose, or give rise to any duty owed by ENGINEER or CONSULTANT to Owner, any Contractor, Contractor's subcontractor, supplier, other individual or entity, or to any surety for or employee of any of them.

2. All duties and responsibilities undertaken pursuant to this Agreement will be for the sole and exclusive benefit of ENGINEER and CONSULTANT and not for the benefit of any other party.

We consider these provisions determinative as they make clear McGhee and Strand's intention that Strand's contractual obligations were only to McGhee, not to

---

**11.** Acuity argues that Strand did not raise the absence of a contract between Strand and Logan Todd in its motion for summary judgment and, therefore, waived this issue. We note, however, that Strand asserted the economic loss doctrine as a defense in its answer to Acuity's complaint. Moreover, in order to address Logan Todd/Acuity's cause of action against Strand for breach of contract, we must consider the existence or nonexistence of a contract between Logan Todd and Strand.

any other parties involved in the construction project. Therefore, as to any contractual claims, summary judgment in favor of Strand was appropriate.[12]

**Traughber, geotechnical engineer.** Acuity's claims with respect to tunnel length do not pertain to Traughber. Acuity's claim against Traughber is that the engineering firm breached its obligations by failing to give proper recommendations to insure the stability of the embankment after the initial collapse in October 2002.

There is no dispute concerning the fact that Logan Todd and Traughber entered into a contract concerning the provision of geotechnical services. There was, however, no written contract, and there is considerable dispute as to the terms of the agreement between Logan Todd and Traughber. Acuity takes the position that, as the project's geotechnical engineer, Traughber was generally responsible for advising on geotechnical engineering issues. Traughber asserts that its primary role was to perform a geotechnical investigation of the construction site prior to the bid process. Each party cites portions of the deposition testimony of Berkley Traughber, the principal engineer of Traughber, to support its position. Traughber also cites the deposition testimony of Brent Traughber, the systems manager and executive director for Logan Todd. Berkley Traughber and Brent Traughber are brothers. There is no dispute that Berkley Traughber was asked to recommend a course of action after the initial embankment collapse in October 2002. Acuity has submitted expert testimony to establish that Traughber's advice was not in accordance with professional standards. Traughber asserts and cites testimony that it was only asked to respond to a fact scenario in which the deci-

sion had already been made to continue with the project to allow Tri–State to finish its work.

Viewing the evidence in the light most favorable to Acuity, the nonmoving party, we believe there remain disputed material facts that preclude summary judgment in favor of Traughber.

### (C) Negligence arguments

In its amended complaint, Acuity asserted a number of rights as surety, including its right of equitable subrogation to the rights of Logan Todd. Acuity included causes of action for Engineers' negligent misrepresentations and their negligent preparation and issuance of plans and specifications in addition to breach of contractual obligations. In its order granting summary judgment in favor of Engineers, the trial court made three specific findings: that Acuity had no right of action under the doctrine of equitable subrogation against Engineers, that its claims were barred by equitable estoppel and/or collateral estoppel, and that its negligent misrepresentation claim failed as a matter of law. On appeal, Engineers assert that Acuity has not contested the trial court's dismissal of all negligent misrepresentation claims by virtue of the following footnote in Acuity's brief:

Acuity does not contest the dismissal of the negligent misrepresentation claim because that claim was asserted prior to Acuity subrogating to the owner's rights. The negligent misrepresentation claim was based upon Acuity subrogating to the rights of Peters, not to the rights of Logan Todd. Acuity's claims are now based upon the breach of Defendants' obligations that were owed to the owner and are not based upon mis-

12. Possible negligence claims will be discussed below.

representations made by the Defendants to the Contractor or to Acuity.

This statement in Acuity's brief has understandably created confusion as to what, if any, negligence claims remain viable. In its reply brief, Acuity seeks to alleviate the confusion by stating that "[t]he Chancery Court dismissed the negligent misrepresentation claims only on the basis that *Acuity* could not rely upon representations by the Defendants" and that the trial court "did not rule that *Logan Todd* could not justifiably rely upon representations by its engineers." (Emphasis added). Acuity further argues that "[t]he Chancery Court did not have to address misrepresentation claims held by Logan Todd because the Court had found Acuity could not subrogate to Logan Todd's rights." The amended complaint does include allegations of negligent misrepresentations to Logan Todd as well as to Acuity and alleges that Logan Todd reasonably relied upon those representations to its detriment. In its order, the court found that Acuity's negligent misrepresentation claim failed as a matter of law because there was no justifiable reliance by Acuity on representations by Engineers. Viewing the evidence in the light most favorable to Acuity and making all inferences in its favor, we have concluded that Acuity has not waived any negligence claims asserted as a subrogee to Logan Todd.

 There is an additional issue with respect to Strand. As discussed above, Strand did not have a contract with Logan Todd and did not undertake contractual obligations to Logan Todd. The economic loss doctrine provides that, absent privity of contract, one may not recover in negligence where there is no injury to person or property. *United Textile Workers of Am. v. Lear Siegler Seating Corp.*, 825 S.W.2d 83, 87 (Tenn.Ct.App. 1992). Tennessee law recognizes an ex-

ception to the economic loss doctrine: despite the absence of privity, a plaintiff may maintain an action for purely economic loss based upon negligent supervision or negligent misrepresentation. *John Martin Co., Inc. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 435 (Tenn.1991). Since we have concluded that Acuity has not waived any negligent misrepresentation claims it may have as a subrogee to Logan Todd—i.e., those claims of negligence based upon representations made by Engineers to Logan Todd—Strand remain potentially liable under such a theory.

## III.

### *Res judicata/collateral estoppel*

The engineers assert that the trial court properly held Acuity's claims to be barred by res judicata or collateral estoppel. We disagree.

 Res judicata, or claim preclusion, "bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been raised in the former suit." *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 178 (Tenn.Ct.App. 2000). Collateral estoppel, or issue preclusion, bars the same parties or their privies from relitigating in a second suit issues that were actually raised and determined in the former suit. *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn.1987); *Cihlar*, 39 S.W.3d at 178–79.

What were the issues and who were the parties involved in the prior federal district court litigation at issue in this case? Tri–State Marine Construction, LLC, the marine contractor, brought suit against Heritage Mutual Insurance Company, now known as Acuity, under its payment

bond.[13] Acuity filed a third-party complaint against Logan Todd, Capitol Tunneling, Inc., and Peters Leasing Company. Ruling on Logan Todd's motion for summary judgment, the federal district court determined that Acuity's third-party complaint stated causes of action against Logan Todd for errors in the scale dimensions of the plan drawings, inaccurate reports of subsurface conditions, and a blasting plan change order. In its memorandum, the court stated that "[a]ll other non-indemnity claims or theories related to the collapse of the embankment, measures taken to protect the embankment, and compliance with the Corps of Engineers permit are outside the scope of this third-party action against Logan Todd."

In the present case, Acuity, as subrogee to the rights of Logan Todd, brought suit against the engineers for alleged contractual and professional breaches in allowing Peters to extend the tunnels only 190 feet from the shore well and in failing to take appropriate remedial action after the first embankment collapse in October 2002.

Since the identical issues raised in the present case were not actually or necessarily determined in the federal district court action, collateral estoppel cannot act as a bar. *See Hampton v. Tenn. Truck Sales, Inc.,* 993 S.W.2d 643, 646 (Tenn.Ct.App. 1999). We will, therefore, proceed to consider the applicability of res judicata.

 A party defending on the basis of res judicata has the burden of proving the following elements: "(1) that the underlying judgment was rendered by a court of competent jurisdiction; (2) that the same parties were involved in both suits; (3) that the same cause of action was involved in both suits; and (4) that the

underlying judgment was on the merits." *Lee v. Hall,* 790 S.W.2d 293, 294 (Tenn.Ct. App.1990). The second element requires that the same parties, or their privies, be involved in both suits. *Richardson v. Tenn. Bd. of Dentistry,* 913 S.W.2d 446, 459 (Tenn.1995). For res judicata to apply, Logan Todd and Engineers would have to be privies. Engineers have not presented any arguments or evidence to establish that they should be considered privies of Logan Todd for res judicata purposes.

 The words "privy" and "privity" do not necessarily have the same meaning in the context of res judicata as they do in the context of contractual relationships. *See Putnam Mills Corp. v. United States,* 202 Ct.Cl. 1, 479 F.2d 1334, 1340 (1973). In the context of res judicata, "privity" means "an identity of interests relating to the subject matter of the litigation, and it does not embrace relationships between the parties themselves." *Carson v. Challenger Corp.,* No. W2006–00558–COA–R3–CV, 2007 WL 177575, *3 n. 3 (Tenn.Ct.App. Jan. 25, 2007). The existence of privity or identity of interest depends upon the facts of each case. *Cihlar,* 39 S.W.3d at 181. Engineers were independent contractors on the project at issue. Strand did not even have a contract with Logan Todd. In their briefs, Engineers gloss over the privity requirement and do not make any arguments to support a conclusion that they should be considered privies of Logan Todd.

We, therefore, conclude that the trial court erred in finding Acuity's claims barred by res judicata or collateral estoppel.

---

**13.** A payment bond covers "any amounts that, because of the general contractor's default, are not paid to a subcontractor or material-

man." BLACK'S LAW DICTIONARY 189 (8th ed.2004).

## CONCLUSION

Except with respect to contractual claims against Strand, we conclude that the trial court erred in granting summary judgment in favor of Engineers. This case is remanded to the trial court for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellees, for which execution may issue if necessary.

PATRICIA J. COTTRELL, P.J., M.S., not participating.