**FOR PUBLICATION**



**FILED**

May 09 2014, 10:11 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**EDWARD R. HALL**
Merrillville, Indiana

ATTORNEYS FOR APPELLEES
Beneficial Mortgage Co. of Indiana:

**BRIAN J. PAUL**
**AARON D. GRANT**
Ice Miller
Indianapolis

**MICHAEL R. LIEBER**
Ice Miller
Chicago, Illinois

PNC Bank N.A.:

**BRIAN J. HURLEY**
**TIMOTHY C. KRSAK**
Douglas Koeppen & Hurley
Valparaiso, Indiana

Fidelity National Title Insurance Co.:

**KURT V. LAKER**
Doyle Legal Corporation, P.C.
Indianapolis, Indiana

Meridian Title Corporation:

**JAMES P. KNEPP**
**ANDREA KUREK SLAGH**
Hahn, Knepp and Slagh
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| GUADALUPE PUENTE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1304-PL-159 |
| | ) | |
| BENEFICIAL MORTGAGE CO. OF INDIANA, | ) | |
| PNC BANK, FIDELITY NATIONAL TITLE | ) | |
| INSURANCE CO., and MERIDIAN TITLE CORP. | ) | |
| | ) | |
| Appellees. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Michael N. Pagano, Special Judge
Cause No. 45D09-1010-PL-94

**May 9, 2014**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

This litigation commenced almost twelve years ago with a 2002 quiet-title action filed by James and Rebecca Wolverton concerning the property located at 4728 Hickory Street in Hammond, Indiana (the Property). The Wolvertons are not a party to this appeal. Instead, the appellant is Guadalupe Puente, who subsequently and unsuccessfully attempted to purchase the Property. His attempt ultimately was unsuccessful because, in the process of Puente's attempt to purchase the Property, certain entities failed to discover that the Wolvertons were the titled owners as a result of having purchased it at a tax sale. The appellees consist of four companies involved in some way in Puente's failed purchase. Those companies are: Beneficial Mortgage Company of Indiana (Beneficial), PNC Bank N.A. (PNC), Fidelity National Title Insurance Company (Fidelity), and Meridian Title Company (Meridian).

What began in 2002 as a quiet-title action between the Wolvertons and Beneficial, among others, was eventually re-captioned and renumbered to its present iteration on October 1, 2010. In his complaint, Puente sued Beneficial, Fidelity, Meridian, and PNC under multiple theories of liability. He appeals grants of summary judgment in favor of each individual appellee, presenting multiple issues for review. Our resolution of one of those issues, however, obviates our need to address the remainder. We restate that issue as follows: Did the trial court err in granting summary judgment in favor of Fidelity on the issue of whether Fidelity is entitled to subrogation of Puente's claims?

We affirm.

Kenneth and Kathy Clarke owned the Property until June 7, 2000, when it was sold at

a sheriff's sale pursuant to a decree of foreclosure in favor of the mortgage holder, Beneficial. On September 1, 2000, a sheriff's deed was issued in favor of Beneficial. At the time of sale, and at the time Beneficial received title, delinquent real estate taxes were owed on the Property. On September 13, 2000, the Wolvertons purchased a number of properties, including the Property at issue in the present case, at a tax sale. Two days later, Beneficial recorded the sheriff's deed with respect to the Property. On September 18, 2000, the State auditor executed a tax sale certificate to the Wolvertons, subject to a tax lien of $793.53. On April 18, 2001, the Wolvertons sent certified copies of a Notice of Sale and Redemption Period Expiration to Beneficial. The notice stated as follows:

> YOU ARE HEREBY NOTIFIED that in accordance with IC 6-1.1-25-4.5 James Wolverton has purchased a tax sale certificate for the following described real estate at tax sale held on September 13, 2000, in the Lake County Government Center …:
>
> [Legal description of the Property]
>
> BE IT KNOWN that James Wolverton has the legal right and will file a Petition for the Issuance of a Tax Deed on the above-mentioned real estate … on or after September 13, 2001.
>
> BE IT FURTHER KNOWN that State of Indiana and Beneficial Indiana, Inc. d/b/a. Beneficial Mortgage Co. of IN, as the owner, an occupant and/or a person with a substantial property interest of record is entitled to redeem the above-mentioned real estate under [sic] by paying the amount of the judgement [sic] for taxes, special assessments, penalties and other costs within one (1) year from the date of the tax sale.
>
> The real estate has not yet been redeemed. The purchaser, James Wolverton, or the purchaser's assignees will be entitled to receive a deed to the real estate if it is not redeemed by September 13, 2001. In the event the real estate is redeemed, the purchaser or the purchaser's successors or assignees is [sic] entitled to the reimbursement for additional taxes or special assessments on the

4

real estate that were paid by the purchaser subsequent to the tax sale and before redemption plus 10% per annum on these taxes and special assessments together with the costs of giving notice under the statute and the costs of examining and updating title and court costs IC 6-1.1-25-2.

*Amended Appellant's Appendix* at 72.

On April 30, 2001, Puente purportedly purchased the Property from Beneficial for $39,900. Puente secured a mortgage from National City Bank (now PNC; we will refer to this party henceforth as PNC) in the amount of $37,900 to pay the purchase price. Beneficial issued a Corporate Warranty Deed to Puente purporting to convey the Property to Puente. A Purchase Agreement executed between the two provided that Beneficial would provide Puente with a commitment for an Owner's Title Insurance policy.

Prior to the attempted sale to Puente, PNC and Beneficial contacted Meridian concerning a lender's and owner's Commitment for Title Insurance, respectively. After the closing between Beneficial and Puente, Meridian issued a standard American Land Title Association (ALTA) 10/17/92 policy to Puente and a standard ALTA 10/17/92 lender's policy of title insurance to PNC. Lawyers Title Company, a predecessor of Fidelity (hereinafter referred to as Fidelity) was the underwriter of those policies. On September 14, 2001, the Wolvertons filed a "Verified Petition for an Order Directing the Auditor of Lake County, Indiana To Issue Tax Deed." *Id.* at 129. The Lake County Circuit Court granted the petition and, on January 18, 2002, issued an Order For Issuance of Tax Deed directing the Lake County Auditor to issue a tax deed for the Property to James Wolverton. The Lake County Auditor complied and issued a tax deed that was recorded on March 8, 2002. On

5

May 21, 2002, the Wolvertons filed a quiet-title action, which ultimately was transferred to Lake Superior Court on October 1, 2010.

Meanwhile, Puente and PNC did not learn of the Wolvertons' interest in the Property until a title search was conducted in conjunction with Puente's refinancing of the Property with PNC, which also financed the original purchase. On August 14, 2002, the day before closing on the refinancing, the tax sale to the Wolvertons was discovered following a title search. As a result, Josephine Dedo, an employee of PNC, assisted Puente by submitting a claim to Fidelity[1] on Puente's behalf. That claim was received by claims attorney Michael Maser, who initially thought the problem was a simple matter of failure to record Puente's deed – a problem that could be corrected with relative ease. A subsequent investigation, however, revealed that the problem was more complicated than that, and that the matter "needed to be resolved through litigation." *Id.* at 33.

The Wolvertons offered to sell the Property to Puente at that point for $32,500, which was less than Puente's policy limits. This offer was not accepted. The matter was then referred to Fidelity claims counsel William Slifkin. Slifkin eventually retained attorney James Secrest to represent Puente and PNC. In October 2002, on behalf of PNC and Puente, Secrest filed a Motion to Intervene and a Motion to Set Aside Judgment in the Wolvertons' quiet-title action. Relief was sought on grounds that neither PNC nor Puente "received actual or constructive notice of [the quiet-title] proceedings commenced on May 21, 2002

---

[1] Again, Fidelity was not actually involved at this stage of the proceedings. Instead, Fidelity's predecessor in interest, Lawyers Title Company, was.

notwithstanding [they] had valid and legal interest in the real estate of record." *Id.* at 147. Secrest took no action with regard to the tax-deed litigation. Subsequently, Puente hired private counsel, who represented him throughout the remainder of this litigation. His attorneys included Michael Moran, William Murakoski, and Michael Jasaitis. Secrest continued working in this litigation as counsel for Fidelity.

On January 22, 2003, after consultation with Slifkin, Secrest advised Moran that Puente could refinance his existing mortgage, and that Fidelity would "insure over" any problems created by the quiet-title case. In this context, "insure over" is a term of art meaning that "Fidelity would issue a lender's policy of title insurance to the refinancing lender without making an exception for the quiet title action, and would cover the new lender in the event the quiet title case jeopardized the priority and validity of the new mortgage." *Id.* With this in mind, Puente completed his refinancing with PNC.

In November 2005, Secrest expressed doubts to Beneficial and Fidelity about the strength of their claim against the Wolvertons. In a November 10, 2005 letter to Slifkin, Secrest stated, "but if the [the Wolvertons] file[] a motion for summary judgment, I'm afraid it will cook our goose." *Id.* at 212. On November 11, Secrest sent an email to Rick Malad, Beneficial's attorney, in which he stated, "it occurred to me that if [the Wolvertons] file a motion for summary judgment, we are dead in the water." *Id.* Apparently, Secrest thereafter decided that he would force the Wolvertons to prove their case. Ultimately, the case was set for an Ind. Trial Rule 41(E) hearing due to the Wolvertons' failure to prosecute. That motion was unsuccessful.

7

The parties thereafter entered into mediation and on April 4, 2007, the price term of the Wolvertons' offer to sell to Puente had increased to $74,000. That offer was rejected. Thereafter, with Jasaitis's explicit or implicit consent, Secrest submitted a summary judgment motion, arguing that Puente and PNC did not receive notice required by Ind. Code Ann. § 6-1.1-25-4.6 (West, Westlaw current with all legislation of the Second Regular Session of the 118th General Assembly (2014) with effective dates through May 1, 2014) with respect to the tax deed matter and thus the Wolvertons' tax deed was void. On February 11, 2008, the court ruled on the summary judgment motions before it, concluding in relevant part as follows:

> 5. [PNC] and Guadalupe Puente contend that based on these facts, they were entitled to all notices required under the tax sale statutes. However, the law does not support a finding that [PNC] and Puente were entitled to notice of the pending tax sale perfection on both occasions because both [PNC] and Puente had on [sic] an "after-acquired interest," as opposed to a "substantial interest of public record," at the time [of] the tax sale.
>
> 6. The tax sale created a superior interest in favor of Wolverton on the date the certificate is [sic] issued under IC 6-1.1-24-9 …. The lien Wolverton acquired on September 18, 2000 (when the Tax Sale Certificate was issued) was superior to all interest created before or after the tax sale as a matter of law. This would include all named defendants herein….
>
> 9. … Neither Guadalupe Puente nor [PNC] were entitled to said notice by law because neither party had a substantial interest of public record at the time that the Tax Sale commenced as that term is defined by Indiana law; their interest was merely after-acquired.
>
> 10. … However, as Puente and [PNC] had no interest in the property at the time of the tax sale, they lack standing to challenge the validity of the tax deed. Therefore… Wolverton is entitled to quiet title as no one has asserted a superior interest.

8

*Id*. at 35.

On March 13, 2008, the Wolvertons filed a Request for Hearing on Damages. Puente filed a motion on March 18, 2008 seeking summary judgment against Beneficial with respect to his claim of breach of warranty on the deed. In May 2008, Puente vacated the Property. On September 22, 2008, the trial court determined the Wolvertons were entitled to damages from PNC. It concluded: "Puente consistently made mortgage payments each month to [PNC] during the time he occupied the property, [therefore,] any rental amounts that Wolvertons [sic] lost as a result of Puente's occupancy of the property shall be borne by [PNC] alone, and not by Puente." *Id.* at 234. The court determined that the reasonable rental value of the property was $350 per month. Therefore, the total due to the Wolvertons for lost rent was $21,700 (62 months at $350 per month). The court further concluded that the property increased in value $16,000 during Puente's occupancy as a result of Puente's efforts. Therefore, the court concluded that the increase in value of the property would be subtracted from the damages suffered by the Wolvertons. Accordingly, the court entered judgment in favor of the Wolvertons in the amount of $5700, plus costs of $438. On the same day, the trial court granted summary judgment in favor of Puente with respect to Beneficial's liability for breach of warranty deed. Neither of these rulings was appealed.

On November 8, 2008, Fidelity paid $30,123.65 to PNC in satisfaction of the latter's claim and in full satisfaction of Puente's obligation to repay PNC. Pursuant to the owner's insurance policy, after the payment of PNC's claim, Puente was left with $7776.35, which represented the remainder under his policy limits. Fidelity also paid $7000 to satisfy the

9

$5700 judgment entered against PNC with respect to the Wolvertons' claim of lost rent. Fidelity then discussed with attorney Jasaitis satisfaction of Puente's claim. Fidelity communicated its intent to pay Puente the remainder of the policy after payment was made to PNC, i.e., $7776.35. Fidelity also indicated that the policy includes a right of subrogation in the event a claim is paid, pursuant to which Fidelity claimed a right to pursue claims Puente may have against other parties.

On December 9, 2009, Fidelity formally offered to pay Puente $7776.35 and requested an acknowledgment that Fidelity had subrogation rights to pursue Puente's claims against Beneficial and others. Puente rejected this offer and filed suit against Fidelity, Meridian, and Secrest, and added counts in his action against Beneficial. Those counts are contained in Puente's March 21, 2011 second amended complaint for damages. Against Beneficial, he alleged breach of warranty, bad faith, breach of contract, negligent misrepresentation, and intentional infliction of emotional distress. Against Meridian, he alleged bad faith, breach of contract, and intentional infliction of emotional distress. Against PNC, he alleged bad faith, breach of contract/breach of fiduciary duty, fraud, negligent misrepresentation, intentional infliction of emotional distress, and conversion. Against Fidelity, he alleged bad faith, breach of contract, negligent misrepresentation, and intentional infliction of emotional distress. Against Secrest, he alleged legal malpractice.

In its March 28, 2013 order, the trial court granted Meridian's and Fidelity's motions for summary judgment with respect to the allegations of bad faith. The court also granted Fidelity's and Meridian's respective motions for summary judgment concerning Puente's

10

claims of breach of contract. The court granted Fidelity's motion for summary judgment with respect to the allegation of negligent misrepresentation. The court determined that based upon the doctrine of judicial estoppel, Puente would not be permitted to pursue a claim of negligent misrepresentation against Meridian. Both Fidelity and Puente moved for summary judgment on the question of whether Fidelity could enforce a subrogation right in this case. The court sided with Fidelity and concluded that it could. Finally, the court denied Meridian's motion for summary judgment as to Beneficial's claims of negligence and breach of contract. Further facts will be provided where relevant.

As indicated, Fidelity filed a motion for declaratory judgment on the question of whether it was entitled to subrogation of all of Puente's claims except his claim of legal malpractice against Secrest. Fidelity and Puente moved for summary judgment on this issue. Puente contends the trial court erred in granting Fidelity's motion for summary judgment.

We apply the same standard as the trial court when reviewing its ruling on a motion for summary judgment. *Sees v. Bank One, Ind., N.A.,* 839 N.E.2d 154 (Ind. 2005). A party seeking summary judgment must show "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). Our review is limited to those materials designated to the trial court. T.R. 56(H); *Sees v. Bank One, Ind., N.A.,* 839 N.E.2d 154. We will accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmoving party, and resolve all doubts against the moving party. *Sees v. Bank One, Ind., N.A.,* 839 N.E.2d 154. A trial court's grant of summary judgment is clothed with a presumption of validity, and the

11

appellant bears the burden of demonstrating that the grant of summary judgment was erroneous. *W.S.K. v. M.H.S.B.,* 922 N.E.2d 671 (Ind. Ct. App. 2010).

In this case, the issue is whether Fidelity was entitled to summary judgment on the question of subrogation. Puente argues that subrogation is an entirely equitable remedy and that the equities in this case counsel against subrogation. Fidelity argues, and the trial court held, that *equitable* subrogation is not applicable here. Rather, the plain terms of the insurance policy's subrogation clause eliminated any need to consider the equities because Fidelity is entitled to subrogation as a matter of contractual right. The question therefore is whether the right of subrogation can exist by contract, without the need to resort to a balancing of the equities.

Subrogation is an equitable doctrine long recognized in Indiana. *Wirth v. Am. Family Mut. Ins. Co.*, 950 N.E.2d 1214 (Ind. Ct. App. 2011). It applies whenever a party that is not acting as a volunteer pays the debt of a third party that, in good conscience, should have been paid by the third party. *Id.* When a claim premised upon subrogation is recognized, "a court substitutes another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the right of the creditor in relation to the debt." *Id.* at 1216 (quoting *Erie Ins. Co. v. George,* 681 N.E.2d 183, 186 (Ind. 1997)). The purpose of the doctrine is to prevent unjust enrichment. *Wirth v. Am. Family Mut. Ins. Co.*, 950 N.E.2d 1214.

In support of his argument that the trial court erred in finding a right of subrogation apart from a consideration of the equities, Puente cites several cases that include language that might be construed as supporting his claim. For instance, our Supreme Court has stated:

"[s]ubrogation is a doctrine of equity long recognized in Indiana." *Erie Ins. Co. v. George*, 681 N.E.2d at 186. "The doctrine of equitable subrogation, sometimes misleadingly called 'legal subrogation,' has been recognized in Indiana for over a century." *Bank of New York v. Nally*, 820 N.E.2d 644, 651-52 (Ind. 2005). Finally, this court has indicated that "[t]he right of subrogation is equitable in nature whether or not it is referred to as such in a contract." *Ticor Title Ins. Co. of Cal. v. Graham*, 576 N.E.2d 1332, 1338 (Ind. Ct. App. 1991), *trans. denied*. The latter excerpt seems to provide the strongest argument in support of Puente's position. Is it, however, inconsistent with the proposition that a right to subrogation can be created by contract? We think not.

A survey of the law in other states reveals generally that other jurisdictions recognize two, and in some cases three, types of subrogation, which are grouped by reason of origin (or basis). Those recognizing two kinds of subrogation categorize them as "conventional" and "legal." The former refers to subrogation arising under a contract, while the latter refers to subrogation arising under the common law, or in equity. *See, e.g., Wasko v. Manella*, 849 A.2d 777 (Conn. 2004); *Hartford Fire Ins. Co. v. W. Fire Ins. Co.*, 597 P.2d 622 (Kan. 1979); *Messner v. Am. Union Ins. Co.*, 119 S.W.3d 642, 649 (Mo. Ct. App. 2003); *Blue Cross & Blue Shield of Neb., Inc. v. Dailey*, 687 N.W.2d 689 (Neb. 2004); *Lawyers' Title Guar. Fund v. Sanders*, 571 P.2d 454 (Okla. 1977); *Am. Family Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 757 N.W.2d 584 (S.D. 2008); and *Ruckel v. Gassner*, 646 N.W.2d 11 (Wis. 2002). Those recognizing three kinds of subrogation recognize, in addition to conventional and legal subrogation, subrogation arising by statute. *See, e.g., Hill v. Cross Country*

*Settlements, LLC*, 936 A.2d 343 (Md. 2007); *Shumpert v. Time Ins. Co.*, 496 S.E.2d 653 (S.C. Ct. App. 1998); *Castleman Const. Co. v. Pennington*, 432 S.W.2d 669 (Tenn. 1968). For purposes of this analysis, the addition of statutory subrogation is of no importance. Generally speaking, these jurisdictions are in line with Indiana's view, which recognizes that subrogation can arise both by contract and in equity.

Several jurisdictions have specifically addressed the question presented here, i.e., whether conventional subrogation is subject to equitable considerations, and the decisions have gone both ways. Perhaps the best articulation of the underpinnings of the view that equity does apply were provided by the Tennessee Court of Appeals in *Castleman Const. Co. v. Pennington* 432 S.W.2d 669. The court stated that the distinction among the various types of subrogation concern the source of the right and the determination of whether a right to claim subrogation exists. They do not, however, enter into the separate matter of enforcement of the right or application of the remedy of subrogation. Rather, the question of whether subrogation will be afforded is answered by application of equitable principles. More to the point for our purposes, the court indicated that even in the case of conventional subrogation, "the right of subrogation rests not upon a contract, but upon the principles of natural justice." *Id.* at 675. The court explained:

> to entitle one to subrogation, his equity must be strong and his case clear, since it will not be enforced when the equities are equal, or the rights are not clear, or where it will prejudice the legal or equitable rights of others. Where equities are equal, there is no right to subrogation. However, subrogation will not be enforced against superior equities.

*Id*. (quoting Couch on Insurance 2d, Subrogation, § 16:21). In jurisdictions subscribing to

14

this view, subrogation "will not be enforced when it would work injustice to the rights of those having equities." *Id.* at 674. *See also, e.g., Roberts v. Total Health Care, Inc.*, 675 A.2d 995, 1002 (Md. Ct. App. 1996), ("[r]ecovery under conventional subrogation is based on contract law, but is subject to the principles of equity"), *aff'd,* 709 A.2d 142 (Md. 1998); *Transamerica Title Ins. Co. v. Johnson*, 693 P.2d 697, 702 (Wash. 1985) ("[w]e hold that whether arising by operation of law or under contract, subrogation is an equitable remedy subject to equitable defenses"); *Ruckle v. Gassner*, 646 N.W.2d at 16 ("subrogation is recognized or denied upon equitable principles without differentiation between 'legal subrogation' which arises by application of principles of equity and 'conventional subrogation' arising from contract or the acts of the parties) (quoting *Garrity v. Rural Mut. Ins. Co.*, 253 N.W.2d 512, 515 (Wis. 1989)).

Other jurisdictions have taken the countervailing view, i.e., that equity is not a consideration in cases involving conventional – or contractual – subrogation. This view is thoroughly examined and explained in *Fortis Benefits v. Cantu*, 234 S.W.3d 642 (Tex. 2007). In that case, the court noted that equitable, contractual, and statutory subrogation "represent three separate and distinct rights that, while related, are independent of each other." *Id*. at 648. The court further noted the maxim that "equity follows the law," "requires equitable doctrines to conform to contractual and statutory mandates, not the other way around." *Id*. Accordingly, "[w]here a valid contract prescribes particular remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy." *Id*. at 648-49. This view is premised largely upon the right to contract.

15

There is no doubt that subrogation has its roots in equity. The language employed in *Erie Ins. Co. v. George*, 681 N.E.2d 183, *Bank of New York v. Nally*, 820 N.E.2d 644, and *Ticor Title Ins. Co. of Cal. v. Graham*, 576 N.E.2d 1332, as quoted previously in this opinion, clearly reflects as much. The fact that it originated in equity, however, does not lead inexorably to the conclusion that subrogation will be enforced *only* as an equitable remedy, i.e., only when the equities dictate that it should. Although equitable and contractual subrogation are based upon common principles, they are different in that, as a general rule, contract rights arise from contract language and do not derive their validity from principles of equity. Rather, contractual subrogation's validity is based directly upon the parties' agreement. "The policy declares the parties' rights and obligations, which are not generally supplanted by court-fashioned equitable rules that might apply, as a default gap-filler, in the absence of a valid contract." *Fortis Benefits v. Cantu*, 234 S.W.3d at 647.

This view is consistent with Indiana's broad, long-standing position that parties in Indiana are free to contract as they see fit. Our Supreme Court has observed that Indiana's UCC has, as one of its paramount concerns, "enabling contracting parties to control their own relationships." *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 950 (Ind. 2001). The law generally allows persons of full age and competent understanding significant liberty in crafting and entering into contracts. *Guideone Ins. Co. v. U.S. Water Sys. Inc.*, 950 N.E.2d 1236 (Ind. Ct. App. 2011). "Accordingly, the parties to a contract are free to include in the agreement any provisions they desire so long as such provisions do not offend the public policy of this state." *Id.* at 1247 (quoting *Pinnacle Computer Servs. Inc. v.*

16

*Ameritech Publ'g, Inc.*, 642 N.E.2d 1011, 1014 (Ind. Ct. App. 1994)).

As the court noted in *Fortis Benefits*, a contractual subrogation clause expresses the parties' intent that subrogation should be controlled by agreed contract terms, not external rules imposed under the common law. In fact, this was the point made by the United States Supreme Court in *Sereboff v. Mid Atlantic Med. Servs., Inc.,* 547 U.S. 356 (2006). In that case, Mid Atlantic was an insurer that served as an ERISA-plan fiduciary for the Sereboffs. After the Sereboffs were injured in an auto accident, Mid Atlantic paid their expenses pursuant to the plan. After the Sereboffs settled tort claims stemming from the accident, Mid Atlantic filed suit to collect the medical expenses it had paid on their behalf. Mid Atlantic sought reimbursement under an "Acts of Third Parties" provision in the plan, which authorized such a recovery. The Sereboffs resisted on grounds that equitable principles foreclosed the implementation of the contract provision in question. The Court rejected this argument, deeming the Sereboffs' equitable defenses "beside the point" because Mid Atlantic's subrogation claims arose by written agreement. *Id*. at 368. In the final analysis, we agree with the view expressed by the *Fortis Benefits* court that "contract-based subrogation rights should be governed by the parties' express agreement and not invalidated by equitable considerations that might control by default in the absence of an agreement." *Fortis Benefits v. Cantu*, 234 S.W.3d at 650.

An insurance policy is a contract. *Sheehan Constr. Co., Inc. v. Cont'l Cas. Co.*, 935 N.E.2d 160 (Ind. 2010), *modified on other grounds on reh'g*, 938 N.E.2d 685. In reviewing an insurance policy, we construe the policy as any other contract to give effect to the parties'

intentions at the time the writing was made. *N. Assur. Co. of Am. v. Thomson Inc.*, 996 N.E.2d 785 (Ind. Ct. App. 2013), *trans. denied.* Where the terms of a contract are clear, they are to be accorded their plain and ordinary meaning. *Klepper v. ACE Am. Ins. Co.*, 999 N.E.2d 86 (Ind. Ct. App. 2013), *reh'g denied*.

When it comes to subrogation provisions in insurance policies, we believe the preferable of the two views discussed above is the one articulated in *Fortis Benefits*, and adopted in others jurisdictions as well. *See Allstate Ins. Co. v. Hugh Cole Builder, Inc.*, 772 So. 2d 1145, 1146 (Ala. 2000) ("while the doctrine of subrogation is of purely equitable origin and nature, it may be modified by contract") (quoting *State Farm Fire & Cas. Co.,* 764 So.2d 543, 546 (Ala. 2000)); *Capitol Indem. Corp. v. Strike Zone*, 646 N.E.2d 310, 312 (Ill. Ct. App. 1995) (the court "decline[d] to upset the settled expectations of the parties as reflected in the policy of insurance by overlaying inapplicable equitable principles which contravene the contract terms and forge a new agreement between the parties"), *appeal denied*; *Wine v. Globe Am. Cas. Co.*, 917 S.W.2d 558, 562 (Ky. 1996) ("[u]nder general principles of equity, *in the absence of statutory law or valid contractual obligations to the contrary*, an insured must be fully compensated for injuries or losses sustained (made whole) before the subrogation rights of an insurance carrier arise") (emphasis supplied); *Blue Cross & Blue Shield of Nebraska, Inc. v. Dailey*, 687 N.W.2d at 701 ("*unless a contract specifically provides otherwise*, equitable principles apply even when a subrogation right is based on contract") (quoting *Shelter Ins. Cos. v. Frohlich*, 498 N.W.2d 74, 78-79 (Neb. 1993)) (emphasis in original); *Culver v. Ins. Co. of N. Am.*, 559 A.2d 400, 403 (N.J. 1989) (the court

18

noted that although subrogation is an offspring of equity, if a particular claim of subrogation is based on contract, the contract provisions prevail where they conflict with the principles of equity); *Lager v. Miller-Gonzalez*, 896 N.E.2d 666 (Ohio 2008) (the court concluded that the principles of contract interpretation, not equitable principles or public policy, determine whether subrogation is available where the claim is based upon a subrogation provision in a policy of insurance); *Hill v. State Farm Mut. Auto. Ins. Co.*, 765 P.2d 864 (Utah 1988) (although subrogation is an equitable doctrine that is governed by equitable principles, it can be modified by contract), *disapproved on other grounds by Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127 (Utah 1997). This preserves the freedom to contract that has been a bedrock principle of Indiana law. Ultimately, it places the onus on parties to an insurance contract to negotiate terms as they see fit, and then to abide by the terms of the resulting contract in the event insurance coverage is triggered. *See also Erie Ins. Co. v. George*, 681 N.E.2d at 188 ("[*Imel v. Travelers Indem. Co.*, 152 Ind. App. 75, 281 N.E.2d 919 (1972)] set forth the unremarkable proposition that insurance companies have the right to include subrogation agreements in their insurance policies and that these clauses are generally enforceable").

We note finally that our decision is consistent with a decision of this court holding that the equitable made-whole doctrine may be rendered inapplicable by a subrogation clause in an insurance contract. *See*, *e.g.*, *Wirth v. Am. Family Mut. Ins. Co.*, 950 N.E.2d 1214. The made-whole doctrine is an equitable principle whereby a subrogee is not entitled to subrogation unless and until the subrogor has been compensated completely for the covered

loss. We stated that the made-whole doctrine can be rendered inapplicable by virtue of a subrogation clause in an insurance contract, so long as the contract clearly, unequivocally, and with such certainty "as to admit no doubt on the question" indicates that the made-whole doctrine does not apply. *Id.* at 1217.

In the present case, when Puente purchased the Property from Beneficial. Meridian issued a standard ALTA owner's policy of title insurance to Puente and a lender's policy of title insurance to PNC. Fidelity was the underwriter for both policies. The owner's policy contained the following provision:

> Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

> The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

> If a payment on account of the claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

*Amended Appellant's Appendix* at 396. Clearly, this language is broad enough to confer upon Fidelity a contractual right to subrogation. *See State Farm Mut. Auto. Ins. Co. v. Cox*, 873 N.E.2d 124 (Ind. Ct. App. 2007). Accordingly, the trial court did not err in granting

summary judgment to Fidelity on this issue.

We note, as a final matter, that Puente contends culpable negligence is a valid defense to a claim of contractual subrogation. Even accepting for the moment the dubious proposition that Puente is correct as to its applicability, this argument fails. In *Bank of New York v. Nally*, 820 N.E.2d at 654, our Supreme Court discussed the meaning of "culpable negligence" in this context:

> under Indiana common law, there are no degrees of negligence. It is therefore difficult, at best, to place the term "culpable negligence" within an appropriate frame of reference. Suffice it to say, however, we conclude that the term contemplates action or inaction which is more than mere inadvertence and mistake or ignorance.

Puente alleges that Fidelity's "culpable negligence" consisted of its decision to "insure over" PNC's refinancing of Puente's mortgage in light of Fidelity's knowledge of the Wolvertons' quiet-title lawsuit. There is designated evidence that at the time Fidelity made this decision, Attorney Secrest, representing both PNC and Puente, was of the opinion that Puente might prevail in the quiet-title action. Because of its long history with Attorney Secrest, Fidelity trusted his advice and issued the policy. It turned out that Secrest was wrong and that Fidelity made a mistake to the extent it issued a policy upon the strength of Secrest's professional judgment in this matter. We reiterate, however, that culpable negligence, when it does apply, requires more than a showing of mere inadvertence or mistake. We conclude that Fidelity's decision in this case, although ultimately an incorrect one, was not of such a character as to justify application of the "culpable negligence" exception as described in *Nally*. The trial court did not err in determining that Fidelity was entitled to subrogation

21

pursuant to the insurance contract.

As a final matter, we observe that all of the remaining issues presented by Puente concern matters related to his failed attempt to purchase the Property. Where, as here, an insurer has paid an insured's entire loss under an insurance policy and has attained the right to pursue all causes of action associated with the loss, the insured can no longer sue in its own name. *Erie Ins. Co. v. George*, 681 N.E.2d 183. Instead, the insurer, here Fidelity, stands in the shoes of its insured with respect to those potential causes of action. Simply put, Puente lacks standing to pursue these causes of action against appellees Beneficial, PNC, Meridian, and of course Fidelity.

Judgment affirmed.

MATHIAS, J., and PYLE, J., concur.